**23-12539**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

v.

FLEETCOR TECHNOLOGIES, INC., and RONALD CLARKE,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Georgia

## APPELLANTS' OPENING BRIEF

Noel J. Francisco
Hashim M. Mooppan
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com
hmmooppan@jonesday.com

Donald B. Verrilli, Jr.
Ginger D. Anders
Andra Lim
J. Kain Day
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
  Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com

*Counsel for Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and the accompanying Eleventh Circuit Rules, Appellant FleetCor Technologies, Inc. [NYSE: FLT], states as follows:

FleetCor Technologies, Inc., a publicly traded company, has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## AMENDED CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rules 26.1-1 to 26.1-3, counsel certifies that the following persons and entities may have an interest in the outcome of this case:

1.      Anders, Ginger D. of Munger Tolles & Olson LLP, Counsel for Appellants FleetCor Technologies, Inc. and Ronald Clarke;

2.      Boutros, Michael Awni, Counsel for Appellee Federal Trade Commission;

3.      Caleb, Jessica Arnold of Caplan Cobb LLP, Counsel for Appellants FleetCor Technologies, Inc. and Ronald Clarke;

4.      Caplan Cobb LLP, Counsel for Appellants FleetCor Technologies, Inc. and Ronald Clarke;

5.      Caplan, Michael A. of Caplan Cobb LLP, Counsel for Appellants FleetCor Technologies, Inc. and Ronald Clarke;

6.      Clarke, Ronald, Appellant;

7.      Dasgupta, Anisha S., Federal Trade Commission General Counsel

(added);

8.      Day, J. Kain of Munger Tolles & Olson LLP, Counsel for Appellants

FleetCor Technologies, Inc. and Ronald Clarke;

9.      Doty, James, Counsel for Appellee Federal Trade Commission;

10.      Downing, Levi M. of Kelley Drye & Warren, Counsel for Appellant

Ronald Clarke;

11.      Federal Trade Commission, Appellee;

12.      FleetCor Technologies, Inc. (NYSE: FLT), Appellant;

13.      Francisco, Noel J. of Jones Day, Counsel for Appellant FleetCor

Technologies, Inc. (changed);

14.      Frassetto, Brittany Kaye, Former Counsel for Appellee Federal Trade

Commission;

15.      Glassman, Mark L., Counsel for Appellee Federal Trade Commission;

16.      Goetz, Mariel, Federal Trade Commission attorney (added);

17.      Grossman, Bradley, Federal Trade Commission attorney (added);

18.      Hanks, Daniel, Counsel for Appellee Federal Trade Commission;

19.      Hay, Daniel J. of Sidley Austin LLP, Counsel for Appellant FleetCor

Technologies, Inc.;

20.     Hopson, Mark D. of Sidley Austin LLP, Counsel for Appellant
FleetCor Technologies, Inc.;

21.     Jones Day, Counsel for Appellant FleetCor Technologies, Inc.
(changed);

22.     Kane, Thomas, Former Counsel for Appellee Federal Trade
Commission;

23.     Kelley Drye & Warren, Counsel for Appellant Ronald Clarke;

24.     Kost, Thomas Charles, Former Counsel for Appellee Federal Trade
Commission;

25.     Leach, Christopher, Former Federal Trade Commission attorney
(added);

26.     Lim, Andra of Munger Tolles & Olson LLP, Counsel for Appellants
FleetCor Technologies, Inc. and Ronald Clarke;

27.     Madden, Gregory J., Counsel for Appellee Federal Trade
Commission;

28.     Mooppan, Hashim M. of Jones Day, Counsel for Appellant FleetCor
Technologies, Inc. (changed);

29.     Mundel, Benjamin M. of Sidley Austin LLP, Counsel for Appellant
FleetCor Technologies, Inc.;

30.     Munger Tolles & Olson LLP, Counsel for Appellants FleetCor Technologies, Inc. and Ronald Clarke;

31.     Nawaday, Jaimie L. of Kelley Drye & Warren, Former Counsel for Appellant Ronald Clarke (changed);

32.     Rothfarb, Lisa, Counsel for Appellee Federal Trade Commission;

33.     Sidley Austin LLP, Counsel for Appellant FleetCor Technologies, Inc.;

34.     Stone, Julia Blackburn of Caplan Cobb LLP, Counsel for Appellants FleetCor Technologies, Inc. and Ronald Clarke;

35.     Tankersley, Michael E., Counsel for Appellee Federal Trade Commission;

36.     Totenberg, Amy, U.S. District Judge;

37.     Verrilli, Donald B. of Munger Tolles & Olson LLP, Counsel for Appellants FleetCor Technologies, Inc. and Ronald Clarke;

38.     Villafranco, John E. of Kelley Drye & Warren, Counsel for Appellant Ronald Clarke

*Federal Trade Commission v. FleetCor Technologies, Inc., et al.*
**No. 23-12539**

Date: November 15, 2023

Respectfully Submitted,

<u>s/ Donald B. Verrilli, Jr.</u>
Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW
  Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Appellants*

**STATEMENT REGARDING ORAL ARGUMENT**

Counsel for FleetCor Technologies, Inc. ("FleetCor") and Ronald Clarke (collectively, "Appellants") respectfully request oral argument pursuant to Federal Rule of Appellate Procedure 34. This case presents complex questions of law and fact, including important issues regarding the scope of the district court's authority to issue an injunction under 15 U.S.C. § 53(b). Oral argument will aid the Court in understanding the factual and legal issues presented.

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................C-1

AMENDED CERTIFICATE OF INTERESTED PERSONS ..............................C-1

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF AUTHORITIES ....................................................................................iv

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT OF THE ISSUES................................................................................1

INTRODUCTION .....................................................................................................1

STATEMENT OF THE CASE...................................................................................5

I.    FACTUAL BACKGROUND AND PROCEEDINGS BELOW....................5

II.   STANDARD OF REVIEW...........................................................................21

SUMMARY OF ARGUMENT ...............................................................................21

ARGUMENT ...........................................................................................................24

I.    THE EXPRESS INFORMED CONSENT PROVISIONS OF THE
      INJUNCTION ARE IMPROPER (COUNTS IV-V RELATED TO
      UNAUTHORIZED FEES). ...........................................................................24

     A.    The Express Informed Consent Provisions of the Injunction Are
          Not Necessary to Stop an Ongoing Violation of the FTC Act. ..........28

     B.    FleetCor's Past Practices Do Not Justify the Injunction's
          Express Informed Consent Provisions. ..............................................32

     C.    The Liability Ruling that Was the Predicate for the Injunction
          Was Erroneous. ...................................................................................37

     D.    The Express Informed Consent Provisions of the Injunction
          Must Be Vacated in Whole or in Part. ...............................................40

ii

II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
       JUDGMENT THAT FLEETCOR'S OTHER PRACTICES WERE
       DECEPTIVE OR UNFAIR (COUNTS I-III, COUNTS IV-V
       RELATED TO LATE FEES)..................................................................41

       A.    Genuine Disputes of Material Fact Prevented Summary
             Judgment on the FTC's Deception Counts. .........................................42

             1.    The District Court Resolved a Factual Dispute About the
                   Overall Impression of FleetCor's Per-Gallon Discounts
                   (Count I)......................................................................................42

             2.    The District Court Resolved a Factual Dispute About
                   Whether Fuel-Only Cards Were Limited to Fuel-Only
                   Purchases (Count II). .................................................................49

             3.    The District Court Resolved a Factual Dispute About the
                   Overall Impression of "Transaction Fees" (Count III). ............51

       B.    Genuine Disputes of Material Fact Should Have Prevented
             Summary Judgment on the FTC's Unfairness Counts Related to
             Late Fees (Counts IV and V).............................................................54

III.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY
       JUDGMENT ON MR. CLARKE'S PERSONAL LIABILITY. ..................57

CONCLUSION....................................................................................................62

CERTIFICATE OF COMPLIANCE.....................................................................64

CERTIFICATE OF SERVICE .............................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*AMG Capital Management, LLC v. FTC*,
141 S. Ct. 1341 (2021)..................................................................8, 21

*Anderson v. Amazon.com, Inc.*,
490 F. Supp. 3d 1265 (M.D. Tenn. 2020) ........................................30

*Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*,
135 F.3d 750 (11th Cir. 1998) ..........................................................21

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
304 F.3d 1167 (11th Cir. 2002) .........................................................25

\* *Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) .....................................................30, 31

*Dominic v. DeVilbiss Air Power Co.*,
493 F.3d 968 (8th Cir. 2007) .............................................................60

*Expressions Hair Design v. Schneiderman*,
581 U.S. 37 (2017).............................................................................52

*In re Facebook Biometric Info. Privacy Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016).............................................30

*Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*,
21 F.4th 1267 (11th Cir. 2021) .........................................................25

*Ford v. Hotwire, Inc.*,
2008 WL 5874305 (S.D. Cal. Feb. 25, 2008).....................................30

*FTC v. Alcoholism Cure Corp.*,
2011 WL 13137951 (M.D. Fla. Sept. 16, 2011)................................48

*FTC v. AMG Servs., Inc.*,
29 F. Supp. 3d 1338 (D. Nev. 2014)..................................................48

*FTC v. Brown & Williamson Tobacco Corp.*,
778 F.2d 35 (D.C. Cir. 1985) .................................................................48

*FTC v. Cap. Choice Consumer Credit, Inc.*,
2003 WL 25429612 (S.D. Fla. June 2, 2003) .....................................48

*FTC v. Colgate-Palmolive Co.*,
380 U.S. 374 (1965) ...............................................................33, 42

*FTC v. Cyberspace.com LLC*,
453 F.3d 1196 (9th Cir. 2006) ...........................................................47

\* *FTC v. DIRECTV, Inc.*,
2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ...........................................passim

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ...............................................................44

*FTC v. Gem Merchandising Corp.*,
87 F.3d 466 (11th Cir. 1996) ...............................................................24

*FTC v. Johnson*,
96 F. Supp. 3d 1110 (D. Nev. 2015) .......................................................57

*FTC v. LendingClub Corp.*,
2020 WL 2838827 (N.D. Cal. June 1, 2020) ..........................................49

*FTC v. National Lead Co.*,
352 U.S. 419 (1957) ...............................................................33

*FTC v. On Point Cap. Partners LLC*,
17 F.4th 1066 (11th Cir. 2021) .......................................8, 42, 48, 57

\* *FTC v. Primary Grp., Inc.*,
713 F. App'x 805 (11th Cir. 2017) .......................................................58

*FTC v. Royal Milling Co.*,
288 U.S. 212 (1933) ...............................................................33

**Page(s)**

\* *FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019) ...............................................................56

*FTC v. USA Fin., LLC*,
415 F. App'x 970 (11th Cir. 2011) .....................................................43

*FTC v. World Media Brokers*,
415 F.3d 758 (7th Cir. 2005) ..............................................................60

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012) ................................................30

*Garrido v. Dudek*,
731 F.3d 1152 (11th Cir. 2013) ..........................................................41

\* *Gulf Oil Corp. v. FTC*,
150 F.2d 106 (5th Cir. 1945) ........................................................23, 43

*Harris v. Las Vegas Sands LLC*,
2013 WL 5291142 (C.D. Cal. Aug. 16, 2013) ...................................30

*Jones v. UPS Ground Freight*,
683 F.3d 1283 (11th Cir. 2012) ..........................................................21

\* *LabMD, Inc. v. FTC*,
894 F.3d 1221 (11th Cir. 2018) ...............................................8, 31, 38

*Larsen v. Citibank FSB*,
871 F.3d 1295 (11th Cir. 2017) ..........................................................38

*M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*,
553 F.3d 315 (4th Cir. 2009) ..............................................................41

*Mallet & Co. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) ................................................................35

*Meek v. Metro. Dade Cnty., Fla.*,
985 F.2d 1471 (11th Cir. 1993) ..........................................................34

**Page(s)**

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ..........................................................32, 36

\* *Murray Space Shoe Corp. v. FTC*,
    304 F.2d 270 (2d Cir. 1962) .......................................................43, 52

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ..............................................................32

\* *Orkin Exterminating Co., Inc. v. FTC*,
    849 F.2d 1354 (11th Cir. 1988) ...................................................29, 31

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
    261 F.3d 1188 (11th Cir. 2001) .........................................................25

*Reich v. Occupational Safety & Health Review Comm'n*,
    102 F.3d 1200 (11th Cir. 1997) .........................................................25

*Removatron Int'l Corp. v. FTC*,
    884 F.2d 1489 (1st Cir. 1989)............................................................48

*Selden v. Airbnb, Inc.*,
    4 F.4th 148 (D.C. Cir. 2021)..............................................................32

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953)...........................................................................21

*Williams v. Obstfeld*,
    314 F.3d 1270 (11th Cir. 2002) .........................................................58

*Zamber v. Am. Airlines, Inc.*,
    2020 WL 1445479 (S.D. Fla. Feb. 11, 2020) ..............................30, 32

**FEDERAL ADMINISTRATIVE DECISIONS**

*In re Thompson Med. Co.*,
    104 FTC 648, 1984 WL 565377 (1984) .............................................47

**FEDERAL STATUTES**

\* 15 U.S.C. § 45 .............................................................................passim

**Page(s)**

15 U.S.C. § 45(a) ................................................................................42

15 U.S.C. § 45(a)(1) ..............................................................................8

15 U.S.C. § 45(b) ................................................................................56

\* 15 U.S.C. § 45(n) ....................................................................3, 8, 26, 29

\* 15 U.S.C. § 53(b) .........................................................................1, 7, 56

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1337(a) ..............................................................................1

28 U.S.C. § 1345 ..................................................................................1

**OTHER AUTHORITIES**

Florencia Margotta-Wurgler, *Will Increased Disclosure Help?
Evaluating the Recommendations of the ALI's "Principles of the
Law of Software Contracts,"* 78 U. Chi. L. Rev. 165, 168 (2011)....................37

# JURISDICTIONAL STATEMENT

The Federal Trade Commission filed this action under 15 U.S.C. § 53(b). The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 1345. The district court entered final judgment on June 8, 2023. Appellants timely filed a notice of appeal on August 3, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1. Do the "Express Informed Consent" provisions of the injunction exceed established limits on the district court's remedial authority?

2. Did the district court err by resolving genuine disputes of material fact and making inferences in the FTC's favor when it granted the FTC's motion for summary judgment?

3. Did the district court err in granting summary judgment to the FTC on the personal liability of FleetCor's CEO when the evidence of his knowledge of FleetCor's challenged conduct was thin and disputed?

# INTRODUCTION

This appeal involves a textbook example of FTC overreach. FleetCor provides valuable services to companies in more than 100 countries. Its principal service—the one at issue here—is the provision of fuel cards, which are special-purpose credit cards that businesses use to purchase fuel. FleetCor has served

1

businesses as large as FedEx and as small as local moving companies for many years without incident, to the evident satisfaction of its loyal and growing base of thousands of customers.

In December 2019, the FTC nevertheless launched a broadside attack on FleetCor, alleging that it engaged in deceptive or unfair trade practices in violation of Section 5 of the FTC Act. While the FTC's complaint attacked a host of FleetCor's practices, its principal focus was on FleetCor's methods of obtaining informed consent from customers for fees that customers would be charged in connection with their fuel cards. Despite the existence of serious factual disputes regarding FleetCor's informed-consent practices—as well as every other claim made by the FTC—the district court entered summary judgment for the FTC across the board. The court then went on to enter a sweeping and onerous permanent injunction that forces FleetCor to make substantial changes to core business practices that are indisputably lawful.

This appeal challenges three aspects of the district court's remarkable and unprecedented rulings.

*First*, the district court vastly exceeded well-established limits on its remedial authority when it imposed on FleetCor a set of new and burdensome requirements for obtaining informed consent from its customers for fees associated with their fuel cards. Under Section 5 of the FTC Act, a company acts lawfully if it provides its

2

customers a reasonable opportunity to avoid any harm. 15 U.S.C. § 45(n). The informed-consent methods that FleetCor has had in place for years—including when the district court imposed its injunction—did exactly that. FleetCor presented each customer with a hyperlink to a web page that prominently displayed a customized chart listing each specific feature or program the customer had chosen and each specific fee the customer would incur, as well as all other applicable terms and conditions. And FleetCor required each customer to click a box stating that the customer had read and agreed to the disclosed terms.

The district court, however, ordered FleetCor to abandon these ubiquitous practices and instead implement a set of onerous additional requirements—including that fee disclosures be "unavoidable," that hyperlinks never be used, and that individualized consent be obtained for each specific fee—which go far beyond what Section 5 requires. The court did not (and could not) hold these requirements necessary to stop ongoing unlawful conduct by FleetCor, as the company's existing practices were plainly lawful. Even the FTC conceded it was "not challenging any of FleetCor's current business practices." Appx0811-0812. Nor did the court find these requirements necessary to prevent either the recurrence or the effects of prior unlawful conduct—a finding that would have been utterly implausible given the undisputed fact that FleetCor had obtained informed consent from virtually all of its customers using its lawful methods at the time the injunction was issued. Instead,

the district court's orders reflected dissatisfaction with FleetCor's past, long-since-abandoned informed-consent practices. But to justify injunctive relief, a court must find it necessary to stop ongoing unlawful conduct or to prevent the recurrence or the effects of prior unlawful conduct. The district court made *none* of these findings, so its injunction should not stand.

*Second*, while the FTC's allegations are all unfounded, at the very least, there are material factual disputes that foreclose the district court's finding of liability *at summary judgment*. FleetCor presented massive amounts of evidence that contradicted every claim the FTC made on every count in its complaint. Take for example the issue of improper late fees. Based principally on a handful of years-old customer complaints that were inadmissible hearsay, the FTC contended that FleetCor charged late fees for payments that were actually timely. In response, FleetCor introduced employee testimony that, in 2018 (before the FTC sued), FleetCor had adopted new payment-processing systems pursuant to which payments were processed on the day they were received, as well as expert testimony showing that those customers charged late fees had in fact paid late. Yet the district court improperly resolved those factual disputes against FleetCor without a trial. And it did likewise for the FTC's other claims.

*Third*, there is absolutely no basis for the district court's holding that FleetCor's CEO, Ron Clarke, was personally liable for the violations it improperly

found.  Clarke runs a vast and far-flung business that employs 10,000 people around the world.  He had no involvement at all in the conduct alleged by the FTC, much less the kind of detailed personal knowledge and involvement that would justify the extraordinary step of holding him individually liable.

For all of these reasons, the district court's summary judgment and injunction orders should be vacated.

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND AND PROCEEDINGS BELOW

1.  FleetCor is a Fortune 1000, publicly-traded company headquartered in Atlanta, Georgia.  Appx0818.  FleetCor offers a variety of payment solutions in more than 100 countries; its core product is fuel cards, which are special-use credit cards that allow businesses to purchase fuel, including at gas stations.  Appx0763.  Fuel cards provide a range of benefits, including spending reports, a replacement for cumbersome reimbursement systems, methods for tracking fuel economy, and access to credit.  Appx0764.

All of FleetCor's customers are businesses.  Appx0763.  They range from well-known companies like FedEx, Coca-Cola, and Lowe's, to smaller businesses such as florists and moving companies.  Appx0763.  To serve its diverse customer base, FleetCor offered nearly 100 different card programs over the relevant period.  Appx0764.  Each had its own set of features and marketing materials.  Appx0767.

As with most credit cards, FleetCor's cards have terms and conditions that govern the customer relationship and provide for certain fees. Issues involving those fees are at the core of this appeal. Until the end of 2019, FleetCor—unlike its competitors—did not charge an annual or monthly card fee. Appx0775. Instead, FleetCor maintained a fee structure that varied depending on customers' choices and risk profiles. Appx0775-0776, 0782. For instance, a customer might incur a fee for using the card at an out-of-network gas station (much like an ATM fee). FleetCor also offered certain "add-on" programs (such as enhanced reporting or additional fraud protection) with their own separate fees.

As is typical in the credit-card industry, the most comprehensive disclosure of terms, conditions, and fees is included in each FleetCor customer's terms-and-conditions document. Appx0769-0772. Since at least 2017, all FleetCor terms and conditions have included a fee box on the front or back page disclosing the most important and common fees. The versions in place from the end of 2019 through the injunction vary slightly by product, but all look like the example shown below:

**Fuelman**

**FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC**
**FUELMAN FLEET CARD CLIENT AGREEMENT**

**Summary of Rates, Fees, and Other Costs**

| Category | Fee / Rate |
|---|---|
| **Important Note:** Please review all of these materials so that you are fully informed about your terms and conditions. We may change the rates, fees, and terms summarized below at any time by giving you written notice of such changes. | |
| **Program Fees** | |
| Card Program Packages | We offer three Card Program Packages: <br> • Regular - **$4** per card per month <br> • Plus - **$8** per card per month <br> • Premium - **$12** per card per month |
| **Other Fees & Charges** | |
| Late Payment | • Greater of **$75** or **12.25%** of New Balance |
| Finance Charge | • **32%** APR or maximum allowed by applicable law |
| High Credit Risk Account (Level 2 Pricing) | • Incremental charge of up to **30¢** per gallon |
| Returned Payment | • **$50** per occurrence |
| Non-Standard Payment Option | • **$50** for checks not sent to address indicated on invoice <br> • **$15** per Representative assisted Check by Phone payment <br> • **$10** per Fuelman initiated EFT/ACH debit <br> • **$50** per Client initiated ACH/Wire payment |

Screenshot from Appx0770-0771.[1]  In addition, at least once a month, FleetCor sends customers a Fleet Management Report, which itemizes all fees incurred during the reporting period.  Appx0771-0772.

2.  On December 20, 2019, the FTC sued FleetCor under Section 13(b) of the FTC Act, alleging that FleetCor engaged in unfair or deceptive practices. Appx0040.  Section 13(b) provides that the FTC "may bring suit" in district court if it has "reason to believe" that the defendant "is violating, or is about to violate, any provision of law enforced by the" FTC.  15 U.S.C. § 53(b).  The FTC alleged that FleetCor was violating Section 5 of the FTC Act, which prohibits "unfair or

---

[1] This fee box is modeled on the "Schumer Box" required of consumer credit cards. Appx1741, 1916.  FleetCor does not offer consumer credit cards, but adopted the "Schumer Box" to benefit customers.

deceptive acts or practices in or affecting commerce." *Id.* § 45(a)(1). Under Section 13(b), the FTC may obtain only prospective injunctive relief. *See AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).

Counts I through III of the complaint alleged that FleetCor engaged in deceptive advertising. To prove deception, the FTC must show that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021) (citation omitted). Count I alleged that FleetCor failed to disclose the limitations on its rebate and discount offerings. Appx0088-0089. Count II alleged that FleetCor marketed certain fuel cards as "fuel only," when the cards could also be used to make non-fuel purchases. Appx0089. Count III alleged that FleetCor advertised that certain cards had no transaction fees, when in certain circumstances customers might be charged on a per-gallon or per-transaction basis. Appx0090.

Counts IV and V alleged that FleetCor engaged in unfair and deceptive trade practices. Appx0090-0091. A practice cannot be deemed "unfair" under Section 5 of the FTC Act unless it inflicts "substantial injury" that is not "reasonably avoidable" by consumers, the injury is not outweighed by countervailing benefits, and the practice violates well-established common-law or statutory policies. 15 U.S.C. § 45(n); *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1231 (11th Cir. 2018). Count

V alleged that two sets of FleetCor fees were "unfair": late fees and what the district court termed other "unauthorized" fees. Appx0091. With respect to late fees, the FTC contended that FleetCor sometimes charged late fees for on-time payments. With respect to allegedly unauthorized fees, the FTC alleged that FleetCor failed to disclose in a sufficiently clear manner the fees that might be charged in particular circumstances. Count IV, which depended on Count V, alleged that FleetCor committed a deceptive practice each time it charged those fees. Appx0090-0091.

3. At summary judgment, FleetCor presented substantial factual and expert evidence demonstrating that the practices challenged by the FTC were lawful. As explained below, starting before the FTC filed suit in December 2019, FleetCor changed the structure of its card offerings, the content of its advertisements, and its fee disclosures. By 2020, FleetCor had discontinued all of the relevant advertising and fee practices so that this suit challenged *past*—not ongoing—conduct. Appx0811-0812; *see also* Appx1188-1189, 1197-1199, 1205-1210.

***Advertisements challenged in Counts I-III.*** In 2019-2020, FleetCor instituted improved disclosures, Appx0815, 1927; required FleetCor's compliance and legal team to approve new advertising claims, Appx1217; and ceased making certain claims in advertising, including those at issue, Appx1926. The advertisements the FTC challenged are no longer run. Appx1736.

9

***Late fees challenged in Counts IV and V.*** In 2018—well before the FTC filed its complaint—FleetCor instituted a new online payment system, now used by nearly all customers, that permits same-day posting of all online payments and lets customers schedule payments in advance. Appx1216, 1241, 1386-1391, 1919, 1959-1960.

***Other "unauthorized" fees challenged in Counts IV and V.*** In 2019-2020, FleetCor overhauled its fee structure, so that all but one of the allegedly "unauthorized" fees are no longer charged to new customers. Appx0784, 1878, 1894, 1903, 1906-1907; *see also* Appx1881-1882 (High Risk Fee still charged on some products). Instead of charging fees for individual optional add-on programs as it did previously, FleetCor since 2020 has allowed new customers to choose among packages with particular features (including the former add-on programs) for a single monthly fee. Appx1878-1879, 1881; *see also* Appx1996.

***"Express informed consent" project.*** Most significantly, in 2019—before the FTC filed its complaint—FleetCor began an overhaul of its express informed-consent methodology to ensure that existing customers were aware of, and consented to, all fees applicable to their accounts. Appx1878-1879, 1987. FleetCor completed that effort in 2020. Appx1967. FleetCor also modified its disclosures to new customers at sign up around 2019. Appx1200-1201, 1951.

To obtain renewed consent from existing customers, FleetCor used its online portal and emails to reach them. Upon logging into the portal, each customer was presented with a pop-up with a hyperlink to FleetCor's terms and conditions. Appx2003. Clicking that hyperlink took the customer to the terms and conditions, with a box at the top of the display that was customized to the individual customer and separately disclosed each program the customer had chosen (including add-on programs) and each fee charged in connection with those programs. Appx1911-1912, 2004. The pop-up asked the customer to confirm "that you have READ and AGREE to the new Terms and Conditions (including the summary of rates and fees)." Appx2005. The pop-up also stated: "[i]f you have questions or don't agree, please call 615-370-7841." Appx2005. FleetCor ensured that it had sufficient customer-service staff so that wait times for calls were typically less than 30 seconds. Appx1914.

# TERMS AND CONDITIONS

We're updating our Terms and Conditions to provide more personalized information and to enhance the format. Please confirm that you have READ and AGREE to the new Terms and Conditions (including the summary of rates and fees) on behalf of your Company.

**Account# JR686**   [Terms and Conditions]

☐ I confirm that I have READ and AGREE to the Terms and Condition(s) including fees for the accounts above and I am authorized to do so.

**I AGREE**

**REMIND ME LATER**

If you have questions or don't agree, please call 615-370-7841

ⓘ Please read the linked Terms and Conditions and check the box prior to clicking 'I AGREE.'

**Fuelman**

**FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC**
**FUELMAN FLEET CARD CLIENT AGREEMENT**

**Summary of Rates, Fees, and Other Costs**

| Category | Fee / Rate |
|---|---|
| **Important Note:** Please review all of these materials so that you are fully informed about your terms and conditions. We may change the rates, fees, and terms summarized below at any time by giving you written notice of such changes. | |
| **Program Fees** | |
| Account Administration | • 10¢ per gallon |
| Accelerator Rewards | • $4 per card per month for Elite membership |
| Clean Advantage | • 5¢ per gallon to offset 100% of carbon emission |
| Fraud Protector | • $10 per month for customers with 10 or fewer open cards; <br> • $2 per card per month for customers with more than 10 open cards |
| FleetDash | • $29.97 per month for reporting tools package |
| **Other Fees & Charges** | |
| Extended Network Pricing | • Up to $5 per transaction at select sites/merchants |
| High Credit Risk Account (Level 2 Pricing) | • Incremental charge of up to 30¢ per gallon |
| Late Payment | • Greater of $75 or 12.25% of New Balance |
| Finance Charge | • 32% APR or maximum allowed by applicable law |
| Returned Payment | • $50 per occurrence |
| Non-Standard Billing Frequency | • $2 per card per month |
| Non-Standard Payment Option | • $50 for checks not sent to address indicated on invoice <br> • $15 per Representative assisted Check by Phone payment <br> • $10 per Fuelman initiated EFT/ACH debit <br> • $50 per Client initiated ACH/Wire payment |

**TERMS AND CONDITIONS**

1    <u>Definitions.</u>
1.1    <u>Account.</u> "Account" shall mean the Fuelman account established for you.
1.2    <u>Agreement.</u> "Agreement" shall mean this agreement comprised of the Application (if any), the Approval Letter (if any), and this document containing the Terms and Conditions.
1.3    <u>Application.</u> "Application" shall mean the application or other Fuelman enrollment document you completed when applying for the Account through Fuelman.
1.4    <u>Approval Letter.</u> "Approval Letter" shall mean the letter (if any) sent by Fuelman to you that approves the Application

Screenshots from Appx2003-2004.

FleetCor also sent customers emails with a hyperlink to the terms and conditions, which contained the summary box listing each customer's applicable fees. Appx1913. The email asked each customer to "confirm that you have READ and AGREE to the new Terms and Conditions linked here (including the summary of rates and fees)." Appx2007.

13



Screenshot from Appx2007.

More than 96% of FleetCor's existing customers agreed to the terms and conditions, including the listed fees. Appx1912. About 0.5% called FleetCor to change or cancel their program. Appx2022. About 3.5% did not respond, and FleetCor allowed them to continue to use their cards so as not to disrupt their businesses.[2] Appx2022-2023. Notably, FleetCor's products do not have a fixed term—customers can quit at any time. Appx0765.

---

[2] FleetCor also committed in the eventual injunction proceedings to obtain additional consent from 18,000 existing customers who were paying for the optional add-on programs. Appx2031, 2050. For High Risk Fees, which FleetCor only begins charging if certain credit-risk criteria are met, FleetCor will notify a customer at least one billing cycle before charging the fee. Appx2051.

Well before the FTC filed this suit, FleetCor similarly adopted an industry-standard informed-consent mechanism for new customers. Appx1951. Specifically, when a company applies to use FleetCor's fuel cards online, FleetCor provides it with a hyperlink to FleetCor's terms and conditions, including a summary box of fees. Appx1950, 1975. The company must check a box certifying that it has "read & agree[s] to Product terms & conditions." Appx1998. Checking that box is required before a company can apply to obtain FleetCor's fuel cards. Appx1950.



Screenshot from Appx1998.

For customers who sign up in person or over the phone, FleetCor sends them inactive fuel cards along with terms and conditions.  Appx1953.  To activate the cards, customers must visit a website and click a button confirming that they "have READ and AGREE [to] the Client Agreement contained in [their] package, including the summary of rates and fees," Appx1953, 2000-2001, or confirm the same over the phone, Appx1955-1956.



Screenshot from Appx2001.

FleetCor designed its disclosure and consent mechanisms to match what other companies use, including other credit-card companies and large banks, including Bank of America and Capital One.  Appx1916.

4.  In 2021, the FTC moved for summary judgment on all counts, principally based on FleetCor's pre-complaint conduct.  Appx0187.  FleetCor contended that material factual disputes precluded summary judgment as to liability.  FleetCor also

filed a cross-motion for summary judgment contending (among other things) that no injunction was warranted because the challenged conduct had ceased. Appx0757-0759.[3]

5. In 2022, the district court granted the FTC's motion for summary judgment on liability as to all counts.

The court first addressed FleetCor's advertisements. Appx1628-1673. On Count I, the court held that certain advertisements misleadingly represented that customers would receive certain discounts and rebates "without condition," even though the ads contained disclaimers on their face. On Count II, the court held that advertisements for "fuel only" cards were misleading as a matter of law, based on its mistaken understanding that FleetCor did not dispute that those cards permitted non-fuel purchases. On Count III, the court held that ads promising "no transaction fees" were misleading, discounting FleetCor's evidence that reasonable customers would not have understood the charged fees to constitute "transaction fees."

On Counts IV and V, which the court treated together, the court held that FleetCor had charged "unauthorized" fees because certain fees were not adequately disclosed and were therefore "unexpected." Appx1673-1721. The court also held,

---

[3] In addition to substantial factual evidence, FleetCor presented several expert opinions. The district court excluded portions of the survey analysis of one expert, Dr. Wind. Appx1565.

based exclusively on the FTC's evidence of FleetCor's pre-complaint practices, that FleetCor sometimes mistakenly imposed late fees for on-time payments. For the other fees at issue, the court similarly focused on stale evidence rather than on FleetCor's current procedures for obtaining customers' consent to fees.

The court further held defendant Ronald Clarke—FleetCor's President, CEO, and Chairman of the Board—individually liable for FleetCor's unlawful practices on the ground that he had authority over, and knowledge of, the company's sales practices. Appx1722-1732. Despite evidence that Clarke was not involved in day-to-day marketing and fee-disclosure decisions, the court held that emails and presentations generally pertaining to customer complaints provided the requisite knowledge to support summary judgment as a matter of law.

Finally, the court held that a permanent injunction was warranted. The court acknowledged that FleetCor had discontinued most if not all of the challenged practices. Appx1734-1736. But the court faulted FleetCor for failing to "implement[] an affirmative disclosure process" for its fees, Appx1726—notwithstanding that the 2019-2020 express informed-consent project had accomplished exactly that. The court further justified the injunction on the ground that some of FleetCor's since-discontinued conduct had been "repetitive." Appx1738.

6. The district court then held a two-day evidentiary hearing on the scope of injunctive relief. Before the hearing, the court "sen[t] a bunch of questions" to the parties. Appx1866. Those questions sought basic information about FleetCor's practices at the time, including what fees FleetCor charged and what its fee-disclosure practices then were, making clear that the court had not considered in its summary-judgment ruling FleetCor's evidence of the significant modifications it had made in the preceding several years. At the hearing, therefore, FleetCor presented extensive evidence on its practices with respect to assessing, disclosing, and obtaining consent to various fees at the time, Appx1886; *see also, e.g.*, Appx1886-1891, 1894-1917; the manner in which fees are disclosed in terms and conditions, Appx1872-1876; how customers are notified when FleetCor begins assessing the High Risk Fee, Appx1881-1883; and FleetCor's new fee structure with a single monthly fee, Appx1878-1879. The court asked numerous questions seeking clarity on FleetCor's current practices. Appx1906, 1909, 1914. In short, at the injunction hearing, the court focused for the first time on the comprehensive evidence regarding FleetCor's improved practices for obtaining customers' consent to fees.

Upon concluding the hearing, the court urged mediation. Appx1994. The parties were not able to negotiate a resolution. Appx2008.

7.  In 2023, the court entered a permanent injunction.  Most of the terms reflected measures that FleetCor had already volunteered to undertake during the process of litigating and negotiating the injunction, while continuing to preserve its challenge to the underlying liability ruling.

For this appeal, the injunction's most important provisions are those regarding "Express Informed Consent."  The injunction requires FleetCor to obtain "Express Informed Consent" before it may charge new or existing customers for its services.  Appx2067, 2070, 2072.  A number of provisions spell out the scope of that mandate in ways that are immaterial here, but three are of relevance to this appeal.

First, the injunction states that "Express Informed Consent" requires "Clear and Conspicuous disclosure" of information related to charges.  Appx2065.  To be "Clear and Conspicuous," a disclosure must be "*unavoidable*" when it appears in "any communication using an interactive electronic medium, such as the Internet or software."  Appx2064 (emphasis added).

Second, the injunction provides that there is "*not* … Express Informed Consent to be charged" if "[m]aterial terms" are "disclosed behind a hyperlink or tooltip."  Appx2065-2066 (emphasis in original).[4]  Instead, "[m]aterial terms" must be "disclosed in a dropdown icon or pop-up that requires consumers to provide

---

[4] A tooltip displays text when the user places the cursor over a particular element.

assent immediately after the disclosure of the material terms," or through another method that complies with the injunction. Appx2066.

Third, the injunction provides that FleetCor may not obtain "[a]ssent to more than one charge through a single expression of assent." Appx2064-2066. The injunction thus imposes onerous requirements that go well beyond what FleetCor implemented in 2020 in accordance with industry standards.

## II.    STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment, drawing all inferences in FleetCor's favor. *See, e.g., Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998). If the record presents material factual disputes, this Court must remand for trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291-92 (11th Cir. 2012).

Whether injunctive relief is warranted is reviewed for abuse of discretion. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). The scope of the district court's remedial authority under Section 13(b) is a "purely legal question" reviewed de novo. *AMG Capital Mgmt.*, 141 S. Ct. at 1347.

## SUMMARY OF ARGUMENT

The district court's summary-judgment decision holding FleetCor liable for violating the FTC Act, and its permanent injunction provisions governing "Express Informed Consent," rest on fundamental legal errors and should be vacated.

I.  The Express Informed Consent provisions of the injunction (which relate to Counts IV and V of the complaint) violate established limitations on the district court's equitable authority under Section 13(b) of the FTC Act.  The informed-consent procedures that FleetCor had in place when the injunction was issued (indeed, for years before that) complied fully with Section 5 of the FTC Act because they gave FleetCor's customers ample opportunity to learn of and avoid any unwanted fees associated with fuel cards.

The district court nevertheless ordered FleetCor to radically overhaul those procedures based on a finding that its years-old conduct had not given customers a reasonable opportunity to avoid unwanted fees.  That order was obviously unnecessary to stop ongoing unlawful conduct because FleetCor's practices were lawful when the injunction was entered—and the court did not find otherwise.  Nor was the order necessary to prevent the recurrence of unlawful conduct.  The court made no such finding, which would have been untenable on this record.  And the injunctive order was likewise unnecessary to eliminate the ongoing effects of any prior unlawful conduct.  FleetCor had obtained lawful informed consent from more than 96% of its existing pre-2020 customers and all of new customers thereafter using the lawful methods in place when the injunction was entered.  In all events, the court improperly granted summary judgment to the FTC even with respect to FleetCor's pre-2019 informed-consent procedures, because the court resolved

genuine factual disputes against FleetCor and applied the wrong legal standard for when allegedly "unexpected" fees are "unauthorized" and thus "unfair" under Section 5. There was thus no justification in fact or law for the injunction's onerous Express Informed Consent provisions. Because those Express Informed Consent provisions were not necessary to stop ongoing unlawful conduct, or to prevent the recurrence or remedy the effects of past unlawful conduct, the district court had no authority to impose the provisions.

II. The district court's decision granting summary judgment to the FTC on FleetCor's other practices (Counts I-III, Counts IV-V related to late fees) should be vacated because it rested on multiple legal errors and improperly resolved against FleetCor numerous genuine factual disputes that should have been resolved after a full adversarial presentation at trial.

Counts I through III, which alleged deceptive advertising, turned on quintessential questions of fact, including the net impression that a reasonable FleetCor customer would glean from the ads and whether FleetCor's practices conform to the ads' representations. *See Gulf Oil Corp. v. FTC*, 150 F.2d 106, 108 (5th Cir. 1945). FleetCor presented substantial evidence that its ads accurately reflected its actual policies and practices. In concluding otherwise, the court improperly resolved numerous disputed factual issues against FleetCor.

Counts IV and V include the FTC's allegation that FleetCor unfairly charged customers late fees for on-time payments. In holding FleetCor liable for mistakenly charging late fees, the court committed legal error: because FleetCor modernized its payment system well before the FTC filed its complaint to virtually eliminate the potential for processing glitches, the FTC may not obtain a judgment of liability under Section 13(b). And the court again improperly resolved factual disputes against FleetCor.

III. The district court committed legal error in holding that FleetCor's President and CEO, Ron Clarke, is individually liable for any violations committed by FleetCor. The court lacked any basis for holding that, as a matter of law, he had the requisite knowledge of FleetCor's day-to-day marketing and disclosure practices.

## ARGUMENT

## I. THE EXPRESS INFORMED CONSENT PROVISIONS OF THE INJUNCTION ARE IMPROPER (COUNTS IV-V RELATED TO UNAUTHORIZED FEES).

The injunction's Express Informed Consent provisions should be vacated because they vastly exceed the scope of the district court's remedial authority under Section 13(b) of the FTC Act.

The injunctive authority conferred by Section 13(b) is no broader than courts' "inherent equitable power," *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468

(11th Cir. 1996), which authorizes injunctive relief to address *ongoing* unlawful conduct. *Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d 1200, 1202 (11th Cir. 1997). A court therefore may not enjoin lawful conduct unless the court makes specific findings that doing so is necessary to prevent unlawful conduct or its ongoing effects. *Planetary Motion, Inc. v. Techsplosion, Inc*., 261 F.3d 1188, 1204 (11th Cir. 2001) (an injunction should not "impermissibly prohibit conduct that [the defendant] arguably has the right to do"); *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (an injunction "should not impose unnecessary burdens on lawful activity" (citation omitted)). And even where injunctive relief is proper, "an injunction must be narrowly tailored to the proven legal violations and restrain no more conduct than reasonably necessary." *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1280 (11th Cir. 2021).

The injunction's Express Informed Consent provisions flout those remedial constraints. When the district court issued its injunction (indeed for over three years before), FleetCor's methods of obtaining informed consent for fees associated with its fuel cards indisputably complied with the FTC Act. No customers applying on the web could be charged any fees unless they first clicked a box confirming that they read and agreed to the terms and conditions provided to them via hyperlink that expressly and prominently identified the specific individual fees they would be charged. Over 96% of customers then-existing as of October 2019 gave renewed

consent to their products in that way as well. Customers applying in person or by phone were sent inactive cards that could be activated only when the customers confirmed by phone that they had read and agreed to the paper terms and conditions sent with their cards. So customers could reasonably avoid any unwanted or unexpected fees simply by reading the hyperlinked or paper terms and conditions that prominently displayed the fees on the top of the first page—which they acknowledged doing by clicking the box or calling to confirm that they read and consented to them. Section 5 of the FTC Act does not require that consumers be afforded more than a reasonable opportunity to avoid harm, and FleetCor's practices plainly provided that.

Over the course of a two-day evidentiary hearing to consider injunctive relief, the district court was fully apprised of how FleetCor's informed-consent methods worked at the time and how long they had been in place. Appx1861, 1969. The FTC never sought to prove that those methods violate Section 5, and the district court never found that they did. The court nonetheless entered an injunction that forced FleetCor to overhaul its informed-consent methods by:

- Ordering that FleetCor's fee disclosures be "unavoidable"—effectively rewriting the statute, which bars liability so long as disclosure practices make injury "reasonably avoidable by consumers." 15 U.S.C. § 45(n).

- Forbidding FleetCor from continuing to make disclosures via hyperlinks, even though such disclosures—which reflect industry

standards—obviously provide customers with the means to reasonably avoid unexpected fees; and

- Forbidding FleetCor from obtaining assent to more than one charge through a single expression of consent, even though there is nothing unlawful about disclosing multiple fees and requesting a single expression of consent.

Those injunctive requirements, which go far beyond anything that Section 5 requires, obviously cannot be justified on the ground that FleetCor's existing informed-consent practices violated Section 5 and therefore needed reformation. FleetCor's practices were lawful, and the court did not conclude otherwise. Nor can the injunctive provisions be justified as necessary to "fence in" FleetCor to prevent a recurrence of unlawful past conduct. The district court did not find, that those provisions were necessary to prevent FleetCor from returning to pre-2019 informed-consent methods—and there is no prospect that FleetCor would do so. And the provisions cannot be justified as necessary to eliminate any ongoing effects of past unlawful informed-consent practices. The court made no findings to that effect—doubtless because there were no unlawful effects to undo. FleetCor had obtained informed consent that satisfies Section 5 from well over 96% of its customers using the lawful methods that were in place when the injunction issued. And as if all that were not enough, FleetCor's pre-2019 practices were not unlawful to begin with. The district court's contrary conclusion as to those practices—which was the

predicate for its entry of injunctive relief—contravenes governing law and the summary-judgment record.

In short, the district court had no basis for forcing FleetCor to change its lawful informed-consent methods by implementing the injunction's onerous additional requirements. Those provisions of the injunction should therefore be vacated.

## A. The Express Informed Consent Provisions of the Injunction Are Not Necessary to Stop an Ongoing Violation of the FTC Act.

There is no basis in the record for concluding that the injunction's Express Informed Consent provisions are necessary to stop ongoing illegal conduct. In its summary-judgment ruling that FleetCor violated Section 5 by charging certain "unexpected" fees, the district court pointed to evidence of FleetCor's pre-2020 practices. Appx1686. Even assuming that those practices violated Section 5 (though they do not, *see* Part I.C., *infra*), FleetCor had employed *different* practices that are indisputably lawful for *over three years* before the court entered the injunction. So the injunction, which forces FleetCor to go far beyond anything that Section 5 can be read to require, cannot be justified as necessary to remedy ongoing unlawful informed-consent practices.

The FTC Act provides that a practice cannot be deemed unfair unless it is "likely to cause substantial injury to consumers which is *not reasonably avoidable*

*by consumers themselves* and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n) (emphasis added). The text thus makes crystal clear that a practice is lawful if the customer has the "ability to reasonably avoid injury," because "free and informed consumer choice" is "the best regulator of the market." *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (citation omitted). Customers can "reasonably avoid[]" injury if they have cause "to anticipate the impending harm and the means to avoid it." *Id.* (citation omitted).

The practices FleetCor had in place when the injunction issued satisfy that standard. Like many companies, FleetCor uses hyperlinked disclosures of terms and conditions, paired with a box that customers click to confirm that they have read and consent to the disclosed terms and conditions. Appx2024; *Orkin*, 849 F.2d at 1365. During the sign-up process, the website lists base fees next to the button users click to apply for the card, and customers are directed to the hyperlink for the full terms and conditions. Anyone familiar with consumer credit cards would expect additional information about fees to be found there, Appx1978—and that is especially true for FleetCor's customers, which are all businesses. Customers cannot sign up for fuel cards without checking the box confirming that they have reviewed and agreed to accept the applicable terms and conditions. Customers are thus on notice that it is important to click on the link, and when they do so they see prominently displayed

29

information about fees, including a customized, easy-to-read box that itemizes each specific fee that the customer will agree to pay by consenting to the terms and conditions. Appx1911, 1975.

Those attributes give customers ample "reason to anticipate" being charged fees and ample opportunity to "reasonably avoid" undesired fees by refusing assent. Hyperlinks are a well-understood "twenty-first century" mechanism of "prompt[ing]" customers "to examine terms" by a simple click. *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012). Disclosures via hyperlinks are ubiquitous—and courts have routinely held that hyperlinked disclosures give customers effective notice of, and render enforceable, contractual provisions contained behind hyperlinks. *See, e.g.*, *Zamber v. Am. Airlines, Inc.*, 2020 WL 1445479, at *3 (S.D. Fla. Feb. 11, 2020).[5] As the Ninth Circuit has held, disclosures that would not meet the district court's definition of "unavoidability" can nonetheless give customers notice of fees that enables them to "reasonably avoid" any undesired fees. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (disclosure in partially visible text box made fee "reasonably avoidable"

---

[5] *See also Anderson v. Amazon.com, Inc.*, 490 F. Supp. 3d 1265, 1275-76 (M.D. Tenn. 2020); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016); *Harris v. Las Vegas Sands LLC*, 2013 WL 5291142, at *2, 5 (C.D. Cal. Aug. 16, 2013); *Ford v. Hotwire, Inc.*, 2008 WL 5874305, at *2, 4-5 (S.D. Cal. Feb. 25, 2008); Appx1915.

even though customer could click to indicate agreement without fully scrolling through the text box to see the whole statement). Moreover, the requirement that customers click a box indicating that they have read and agree to the terms and conditions gives them a choice: they can decide that they want to sign up under the applicable terms and conditions that have been disclosed to them, or they can "abort[]" the process and not sign up in light of the terms and conditions. *Id*. at 1169. Customers therefore have both reason to anticipate and the means to avoid undesired fees. *Orkin*, 849 F.2d at 1365.

This Court's decision in *LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018), further confirms that FleetCor's hyperlinked disclosures comply with Section 5. There, this Court concluded that a practice is unfair only if, in addition to failing to provide an opportunity to reasonably avoid injury, the practice *also* violates "a well-established legal standard, whether grounded in statute, the common law, or the Constitution." *Id.* at 1229 n.24. Here, the applicable legal standard must come from contract law, as the FTC's theory of unfairness was that customers who entered into contracts with FleetCor did not actually consent to the contracts' fee provisions. *Id.* at 1231 (determining applicable legal standards based on FTC contentions); *see* Appx1673.

As the decisions cited above reflect, courts routinely hold that hyperlinked disclosure and consent mechanisms indistinguishable from FleetCor's create

enforceable contracts. *Zamber*, 2020 WL 1445479, at *3; *see* p. 30, n. 5, *supra*; *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017); *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156-57 (D.C. Cir. 2021). The hyperlink puts the customer "on *inquiry notice of the term*"—*i.e.*, the customer "has reason to know that it exists"—and the checkbox requires the customer to "assent[] to" the terms and conditions. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) (citation omitted). Thus, FleetCor's hyperlinked disclosures indisputably comply with Section 5. Indeed, a contrary conclusion would cast a cloud over standard ecommerce practices.

After FleetCor implemented its 2019-2020 express consent practices, over 96% of FleetCor's existing customer base agreed to their fees, as did every new customer who joined after the new method was put in place. Whatever may have been the case before 2019, *for years* there has been no ongoing legal violation that could possibly justify granting an injunction to halt it—much less the injunctive provisions imposed here, which go far beyond anything that Section 5 requires. The district court did not make any findings otherwise.

## B. FleetCor's Past Practices Do Not Justify the Injunction's Express Informed Consent Provisions.

Because the injunction's Express Informed Consent provisions were not necessary to stop ongoing unlawful conduct, they could be justified only if the provisions were necessary to remedy the ongoing effects, or prevent the recurrence,

of past unlawful conduct. But the district court did not make, and could not have made, such findings. So the injunction's Express Informed Consent provisions cannot be justified on those grounds either.

The FTC argued below, and the district court evidently agreed, that courts have largely unfettered authority to enter injunctions "fencing in" a defendant whose past conduct was unlawful by prohibiting lawful conduct. Appx1734, 1817, 2062. That is incorrect. The concept of "fencing in," which originated in cases involving FTC cease-and-desist orders, does not entail authority broader than a court's traditional equitable authority, and therefore justifies prohibiting lawful conduct only where doing so is *necessary* to remedy prior conduct found to be unlawful. *FTC v. National Lead Co.*, 352 U.S. 419, 430 & n.7 (1957); *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965); *FTC v. Royal Milling Co.*, 288 U.S. 212, 217-18 (1933).

The district court thus had to find that the injunctive provisions forcing FleetCor to revamp its lawful methods for obtaining informed consent were necessary to address the past conduct found unlawful. *See* Part I.A, *supra*. But the court made no such findings. That is unsurprising: the FTC presented no evidence that making disclosures "unavoidable," using scroll boxes rather than hyperlinks, or prohibiting assent to more than one fee at a time was *necessary* to remedy the effects, or prevent the recurrence, of any allegedly unlawful prior conduct. The record

therefore permits only one conclusion: the district court lacked any basis on which to conclude that requiring FleetCor to revamp its lawful informed-consent procedures was necessary. *Cf. Meek v. Metro. Dade Cnty., Fla*., 985 F.2d 1471, 1478 (11th Cir. 1993) (undertaking analysis in the first instance where "the record clearly shows that only one result" would obtain).

The informed-consent procedures that FleetCor had in place when the injunction was entered ensured that any hypothetical deficiencies of the company's prior practices were remedied and had no continuing effects. *See* p. 10-16, *supra*; Appx1910-1915. Over 96% of existing customers affirmatively agreed to the fees after receiving enhanced disclosures, as did every single new customer. All of FleetCor's customers thus had ample opportunity to consider and avoid the fees FleetCor was charging, and Section 5 requires no more. Going forward, moreover, existing customers receive advance notice of any fees that they trigger later (for instance, FleetCor will notify customers of application of the High Risk Fee, which is charged if certain credit conditions are met, at least one billing cycle in advance). Appx2051, 2071.

Nor is there any likelihood that the conduct the district court found unfair will recur. Given that FleetCor overhauled its product in 2019-2020 (by offering packages with a single monthly fee rather than offering individual optional programs the fee disclosures for which the district court viewed as problematic), and

overhauled its informed-consent practices (by using the hyperlink disclosure and affirmative consent methods described above (Appx0784, 1878, 2023)), there is no reason to think that the company would spend the considerable time and money needed to revert to the long-since-abandoned practices that were the focus of the district court's summary-judgment ruling. *See* Appx1963-1964. Equally to the point, the hyperlinked disclosures forbidden by the district court did not contribute in any way to FleetCor's purported failure to obtain customers' consent to fees. *Cf. Mallet & Co. v. Lacayo*, 16 F.4th 364, 389 (3d Cir. 2021) (lawful conduct may be prohibited if it is "inextricably entwined" with unlawful conduct). Compelling FleetCor to use "unavoidable" disclosures is thus by definition unnecessary to ensure that the disclosure method the district court found unlawful in its summary-judgment ruling will not recur.

Neither of the primary arguments that the FTC made below justifies the injunction's Express Informed Consent provisions. First, the FTC pointed to customer complaints. But *a grand total of four* of FleetCor's 200,000 U.S. customers (or 0.002%) complained they were surprised by fees in 2022. Appx1832-1833. That .0002% figure vividly confirms that FleetCor's informed-consent practices were *effective* in preventing unfairness. *See* Appx1922. Second, the FTC asserted that few existing customers actually clicked on the hyperlink to FleetCor's

terms and conditions.[6] But that does not mean it was necessary to ban hyperlinked terms and conditions to ensure compliance with Section 5. The hyperlinked terms and conditions comply with Section 5 precisely because customers are afforded a reasonable *opportunity* to view applicable fees and decline FleetCor's services. Even if "many users will not bother reading the additional terms, that is the choice the user makes"—and the opportunity to make that choice is all that Section 5 guarantees. *Meyer*, 868 F.3d at 79.

Nor did the FTC provide any reason to think—much less any proof—that its preferred scroll-through method, and its demand for separate consent for each fee charged, would make a difference: no matter the method, consumers cannot be forced to actually read and absorb the disclosures before providing consent. Indeed, when asked by the district court for evidence of the efficacy of FTC's preferred consent mechanisms, the FTC conceded it had none. Appx1981-1984. And the court itself expressed skepticism during the injunction hearing that "a perfect form for indicating informed consent" could in fact address "the practices … that the FTC has identified," Appx1990-1991—an intuition that matches scholarly findings that

---

[6] The FTC drew its cited figure from FleetCor's interrogatory responses. Appx1831-1832. Those responses, however, state that FleetCor's data "is not complete and thus represents the minimum number of clicks." Appx1855. And in all events, the data does not represent clicks reflecting customers' consent but is instead "from a completely different portion of the website." Appx1869.

"an increase in contract accessibility does not result in an economically significant increase in readership," Florencia Margotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts,"* 78 U. Chi. L. Rev. 165, 168 (2011). Given all that, the FTC's preferred informed-consent mechanisms can hardly be *necessary* to ensure that FleetCor does not violate Section 5. There was thus no justification in fact or law to require FleetCor to do more than it was doing.

### C.  The Liability Ruling that Was the Predicate for the Injunction Was Erroneous.

Finally, the Express Informed Consent provisions of the injunction must be vacated because the district court erred in holding that any of FleetCor's informed-consent practices violated Section 5 in the first place. With respect to FleetCor's pre-2019 informed-consent practices, the grant of summary judgment (and injunctive relief) was manifestly improper for three reasons.

*First*, the district court applied the wrong legal standard. It found FleetCor's past practices unfair under Section 5 because the fees were "unexpected"—that is, "customers were not told" about them. *E.g.*, Appx1718-1719. But this Court has required that "the Commission must find the standards of unfairness it enforces in 'clear and well-established' policies that are expressed in the Constitution, statutes,

or the common law." *LabMD*, 894 F.3d at 1231; *id*. at 1228-29. The district court made no such finding. Nor could it.

Under "well-established" contract-law principles that define whether a practice is unfair, *id.* at 1231, a contractual provision that is "unexpected" may still be binding—and therefore *authorized* so long as a consumer had "inquiry notice" of the provision. *Larsen v. Citibank FSB*, 871 F.3d 1295, 1311 (11th Cir. 2017). The district court never evaluated whether the undisputed evidence established that customers were not on inquiry notice of the fees to which they agreed. Without having done so, the court could not conclude that FleetCor's past fee practices were "unfair" within the meaning of Section 5. *LabMD*, 894 F.3d at 1231. And had the court evaluated that question, it would have been compelled to deny summary judgment because FleetCor presented substantial evidence of its fee disclosures, as described *infra*.

*Second*, even if the court could find a Section 5 violation based solely on whether fees were "unexpected," genuine disputes of material fact should have precluded a grant of summary judgment.

The court based its finding that customers suffered "substantial injury" from unexpected fees principally on internal FleetCor documents and a smattering of customer complaints (almost exclusively from 2018 or earlier) purportedly showing that FleetCor did not adequately disclose fees when customers signed up for fuel

cards. Appx1686-1689, 1701 (citing just one document from early 2020). But FleetCor proffered substantial evidence—including witness testimony and internal documents such as training manuals—substantiating that FleetCor's policy was to disclose fees at the outset, and that sales agents were trained to do so. *E.g.*, Appx1227 (Chen Decl.); Appx1247 (Chen Depo.); Appx1343 (Rachide Depo.); Appx0924-0945, 0960-0966, 0981-0982, 1361. That evidence was more than sufficient to create a factual dispute, especially given that the customer complaints on which the court relied were inadmissible hearsay and often involved recollections years after the fact. Yet the district court barreled ahead by concluding that the internal FleetCor emails and those hearsay complaints *overcame* FleetCor's contrary evidence—exactly what a court should *not* do at summary judgment.

The district court also improperly credited the FTC's expert over FleetCor's. Appx1681. The FTC's expert, Dr. Krosnick, opined based on a telephonic survey that only 7% of FleetCor's customers were informed about fees in advance. But FleetCor's experts pointed out that Dr. Krosnick relied entirely on customers' unaided memory of what they were told years or even decades earlier when they signed up for a FleetCor card, and they were encouraged to guess if they (understandably) did not remember—virtually guaranteeing unrepresentative survey results. *E.g.*, Appx1153 (Kahana Report); Appx1224 (Wind Rebuttal Report); Appx1359 (Wind Depo.). At trial, cross-examination would have driven home these

points.  Moreover, FleetCor's expert Dr. Schoar opined that customers' actual behavior when FleetCor enhanced its fee disclosures suggested that customers were in fact aware of the fees all along, thereby contradicting Dr. Krosnick's opinion. Appx1188-1189.  The court discounted Dr. Schoar's study on the ground that whether customers continued to use FleetCor's services after disclosure was irrelevant to whether customers "suffered harm in the form of unexpected fee charges," Appx1694, but a reasonable factfinder could conclude based on that evidence that customer behavior suggested that the fees were not unexpected at all.

*Third*, even if FleetCor's pre-2019 informed-consent practices were unlawful, the district court took no account of the record evidence of the informed-consent methods FleetCor had put in place well before its summary-judgment ruling, which indisputably comply with Section 5—and which show that any lawful conduct was unlikely to recur.  *See* p. 34-35, *supra*.[7]

### D. The Express Informed Consent Provisions of the Injunction Must Be Vacated in Whole or in Part.

Because of the district court's errors, vacatur of the injunction's Express Informed Consent provisions in their entirety is warranted.  At the very least, this Court should order the district court on remand to make the following specified

---

[7] Evidence of the revamped informed-consent methods was submitted during the summary-judgment proceedings as part of Wind's expert report.  Appx1197-1201, 1205-1210.

modifications to the injunction, *see Garrido v. Dudek*, 731 F.3d 1152, 1160 (11th Cir. 2013):

- The sentence "Material terms may not be disclosed behind a hyperlink or tooltip but can be disclosed in a dropdown icon or pop-up that requires consumers to provide assent immediately after the disclosure of the material terms" should be deleted.

- The sentence "In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable" should be revised to state "In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must provide a reasonable opportunity for the customer to review the information that is the subject of the disclosure."

- In the definition of mechanisms that do not constitute "Express Informed Consent," the following bullet point should be deleted: "Assent to more than one charge through a single expression of assent."[8]

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT THAT FLEETCOR'S OTHER PRACTICES WERE DECEPTIVE OR UNFAIR (COUNTS I-III, COUNTS IV-V RELATED TO LATE FEES).

Although the injunction's Express Informed Consent provisions are particularly flawed for the reasons above, the entirety of the summary-judgment

---

[8] This Court should address what constitutes appropriate injunctive relief respecting FleetCor's informed-consent method even if the Court vacates the district court's grant of summary judgment and remands the case for trial, as FleetCor requests in Part I.C. Doing so is necessary to obviate the risk that FleetCor would once again be subject to an onerous injunction that lacks any basis in the law given the record in this case. *See M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 326 (4th Cir. 2009).

ruling should be vacated. On every claim raised by the FTC, the district court improperly resolved factual disputes against FleetCor—notwithstanding substantial evidence demonstrating that FleetCor's practices were neither deceptive nor unfair, and notwithstanding evidence showing that many of the challenged practices had been discontinued long before the FTC filed suit.

## A. Genuine Disputes of Material Fact Prevented Summary Judgment on the FTC's Deception Counts.

The first set of counts—Counts I through III—assert that FleetCor engaged in deceptive advertising. 15 U.S.C. § 45(a). To prove deception, the FTC must show that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." *On Point*, 17 F.4th at 1079 (citation omitted). This inquiry rests "heavily on inference and pragmatic judgment," featuring questions of fact at each step. *Cf. Colgate-Palmolive*, 380 U.S. at 385. With respect to each count, the district court improperly resolved material factual disputes against FleetCor.

### 1. The District Court Resolved a Factual Dispute About the Overall Impression of FleetCor's Per-Gallon Discounts (Count I).

Count I relates to per-gallon discounts that FleetCor offered for certain fuel cards. *E.g.*, Appx0088-0089 (Complaint); Appx1633. The district court concluded that certain advertisements promised "certain per-gallon savings throughout the Fuelman Network and wherever MasterCard is accepted, *without condition or*

42

*caveat*." Appx1641 (emphasis added). That "representation," the court found, was deceptive. But the ads did not make such representations "without condition or caveat." They contained accurate disclaimers that appeared on the face of the advertisements and were highlighted by asterisks appended to the text that the disclaimers modified. The court's ruling therefore depended entirely on its unjustified assumption that the disclaimers could be disregarded because FleetCor's customers would not read them. Appx1633-1640.

The district court thus resolved a quintessential factual dispute against FleetCor. An advertisement's "overall impression" determines what representations it makes and whether those representations are deceptive. *E.g.*, *Murray Space Shoe Corp. v. FTC*, 304 F.2d 270, 272 (2d Cir. 1962); *see also FTC v. USA Fin., LLC*, 415 F. App'x 970, 973 (11th Cir. 2011). The overall "meaning of an advertisement to the public … is a question of fact," *Gulf Oil Corp. v. FTC*, 150 F.2d 106, 108 (5th Cir. 1945), and must be determined from the perspective of a reasonable consumer, *FTC v. DIRECTV, Inc*., 2018 WL 3911196, at *9 (N.D. Cal. Aug. 16, 2018). Here, because (with one exception discussed below) it was undisputed that the disclaimers themselves were accurate, the ads' overall impression turned on whether customers could reasonably read the disclaimers. That was a disputed factual question.

a. The district court relied on the Diesel Platinum Ad as representative. *See* Appx1634.[9] That ad states that FleetCor offers discounts "*up to* 15¢ per gallon." Appx0190. And nearly every representation about "savings" comes with an asterisk, printed in the same font, size, and color, and appearing immediately next to the savings representation. Appx0190. Those asterisks direct the reader to disclaimers at the bottom of the same page, which accurately qualified the statements. Appx0190. Other advertisements further directed customers to visit FleetCor's website, speak to a sales representative in person or on the phone, and consult the relevant terms and conditions. *E.g.*, Appx0190, 0198.

FleetCor presented extensive evidence that the disclaimers were consistent with widespread advertising practices, and thus that reasonable customers can be presumed to read and comprehend them. The disclaimers did not merely appear at the bottom of the advertisement; rather, the reader's attention was drawn to the disclaimer by asterisks appended to the qualified representations. That is a

---

[9] As FleetCor explained below, a court may not conclude that *every* challenged ad was deceptive based only on a few examples. Appx0740. "[E]ach advertisement must stand on its own merits." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir. 2014) (citation omitted). Here, the court never addressed whether its conclusions about a few representative ads could be generalized to the scores of challenged ads, particularly given that those scores of other ads pertained to other products. *DIRECTV*, 2018 WL 3911196, at *8. Even if summary judgment was appropriate, therefore, the liability finding must be limited to the specific ads referenced.

44

universally understood—and ubiquitous—way of signifying to a consumer that a general statement has qualifications. *E.g.*, Appx1184-1185 (Schoar Liability Report); Appx1193-1194 (Schoar Rebuttal Report).

FleetCor also presented evidence that the readers of its ads are sophisticated companies and business owners who would understand the need to read the disclaimers. Appx0791. And even unsophisticated consumers understand that ads for financial products like credit cards come with disclaimers and conditions that modify broad statements about the service. *DIRECTV*, 2018 WL 3911196, at *9.

FleetCor also presented empirical evidence that reasonable consumers would have understood the ads' representations to include the disclaimers and would not have been deceived. Only a miniscule fraction of FleetCor customers complained about the per-gallon discounts. *E.g.*, Appx0790; Appx1202-1204 (Wind Report)[10]; Appx1221 (studying customer-service calls, less than 2% of which addressed discounts). Indeed, the FTC and the court were able to identify only *five* customer complaints—out of hundreds of thousands of FleetCor customers— that suggested confusion about the discounts and rebates at issue. Appx1650-1651. If anything,

---

[10] Although the district court excluded portions of Wind's report, it did not exclude his analysis of customer calls. *See* Appx1571-1572. The district court improperly disregarded even the non-excluded portions in resolving the FTC's summary judgment motion, and on remand, FleetCor should be permitted to present the non-excluded analysis.

that evidence proves that reasonable FleetCor customers would have received an accurate impression from the advertisements.

FleetCor's evidence therefore established a genuine factual dispute as to the overall impression and non-misleading nature of the ads. Neither of the district court's two reasons for discounting that evidence has any merit.

First, the court opined that the disclosures were "tiny." Appx1641. But small print is common, and FleetCor's evidence—especially when viewed, as it must be, in the light most favorable to FleetCor—raised the inference that reasonable customers could and would read the disclaimers. In concluding that FleetCor's customers could not be trusted to do so because they were unsophisticated, the court resolved yet another factual dispute. FleetCor's customers—which are businesses— include many of the nation's largest corporations. At trial, FleetCor employees could have elaborated on the sophistication of FleetCor's customer base based on their personal knowledge. Moreover, the court erred in relying on an internal study describing FleetCor's customers as "fairly unsophisticated." Appx1651. All that document said was that some customers lacked "technical[]" expertise with web-based interfaces. Appx1650.

The court's dismissal of FleetCor's evidence was particularly unjustified given the paucity of the FTC's evidence. Apart from a few customer complaints— the small number of which, again, tends to prove *FleetCor*'s case—the FTC

presented only its own opinion that the disclaimers were "inconspicuous." Appx0198. What the FTC failed to do was present *any evidence* that FleetCor's customers would fail to read the disclaimers, including any survey or expert evidence indicating how customers understood the ads' overall message.[11] *Cf. In re Thompson Med. Co.*, 104 FTC 648, 1984 WL 565377, at *102 n.9 (1984) (noting importance of extrinsic evidence illuminating "[w]hether or not a particular disclosure was clear and prominent"). In those circumstances, the court could not conclude as a matter of law that reasonable customers would not read or understand the ads' qualifications.

Second, the district court erred in relying on other cases finding disclaimers inadequate. Those decisions in fact support FleetCor: they make clear that courts grant summary judgment on deceptiveness only in Section 5 cases involving *scams* that disguise the true nature of the contract offered, often where the disclosures were themselves deceptive elements of the scam. *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1198-1201 (9th Cir. 2006) (mailing disguised as a check was actually an adhesion contract entered into by cashing the check; fine-print notices on the reverse side did not prevent a *quarter million* customers from being deceived); *FTC v. Cap.*

---

[11] Although the court relied on internal surveys suggesting that some customers felt "discounts did not meet their expectations," such general findings could not establish that customers' views resulted from the advertisements in question, or pertained to the same discounts. Appx1649-1650.

*Choice Consumer Credit, Inc.*, 2003 WL 25429612, at *2, *5 (S.D. Fla. June 2, 2003) (service disguised as a credit card; ambiguous disclosure on reverse side in middle of sixty-line paragraph); *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *50-51 (M.D. Fla. Sept. 16, 2011) (false claims of a "cure" for alcoholism; disclosure that perpetrators were "not MD[s]" did not dispel misimpression that they had scientific expertise); *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1351-52 (D. Nev. 2014) (payday loan service understated loan fees by a factor of seven; disclosures did not fully reveal borrowers' obligations and were "scattered" in fine print).[12]

This case involves nothing like those kinds of facially deceptive communications. FleetCor's advertisements provide complete and accurate information in one place, and the only question is whether reasonable customers would read that accurate information. In similar situations, courts have denied summary judgment—or found that the FTC failed to carry its burden entirely. *DIRECTV*, 2018 WL 3911196, at *8-9 (broad statements in advertisements, with

---

[12] In the other cases on which the district court relied, courts of appeals deferentially reviewed *factfindings* concerning whether communications were misleading. *E.g., On Point*, 17 F.4th at 1080 (preliminary injunction); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496, 1497 (1st Cir. 1989) (FTC final action); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42-43 (D.C. Cir. 1985) (permanent injunction). And the disclaimers were either buried in voluminous print, ambiguous, or both. That is not true here—let alone undisputed.

asterisks indicating smaller-text disclosures, were not deceptive); *FTC v. LendingClub Corp.*, 2020 WL 2838827, at *7 (N.D. Cal. June 1, 2020) (reasonable triers of fact could disagree as to whether fees were "hidden" on website). The court should have done the same here.

b. To the extent that the court held that the advertisements did not disclose FleetCor's reserved right to alter its discounts and rebates, Appx1635, 1644-1645, the court committed an additional legal error. Some of FleetCor's ads did include such disclaimers. But even with respect to ads that did not, genuine factual disputes should have precluded summary judgment. FleetCor presented evidence that reservation of the future right to change discounts and fees (subject to notification at the time of the change) is an industry-standard term. Appx0794 (quoting Appx1323-1324 (FTC's expert conceding it is "common" and "legitimate" for rebates to change over time)). FleetCor also presented evidence that customers were notified before any changes were actually made. Appx1250, 1258. That evidence created a genuine dispute of material fact that should have precluded summary judgment.

<h3>2. The District Court Resolved a Factual Dispute About Whether Fuel-Only Cards Were Limited to Fuel-Only Purchases (Count II).</h3>

The district court's holding that FleetCor misleadingly advertised "fuel only" cards that were not so restricted was based on a misreading of the evidence. Appx0089 (Complaint); Appx1655. Properly understood, that evidence creates a

material dispute concerning whether fuel-only cards in fact restricted purchases to fuel. That dispute should have precluded summary judgment.

FleetCor's corporate representative specifically testified that Mastercard cards marketed as "fuel only" were in fact limited to at-the-pump purchases: "If the customer selected *fuel-only*, then it will be the 5542, which is *at the pump*." Appx1353 (emphases added). That is, pursuant to FleetCor's card-software controls, "the customer can then make a purchase at the pump alone," Appx1353, and the card cannot be used to purchase other non-fuel items.

The district court dismissed that testimony based on an apparent misunderstanding. *See* Appx1659. It evidently believed that the at-the-pump restriction was "*another*" option that was "not advertised, nor included in the application materials," and was therefore irrelevant to the accuracy of the "fuel only" card ads. Appx1659. That was simply wrong. To the extent the testimony is ambiguous—and it is not—FleetCor should have been allowed to clarify it at trial.

The court thus erroneously viewed FleetCor as "conced[ing]" that "fuel only" cards could be used to purchase non-fuel items "sold at the gas station." Appx0737, 1659. In fact, FleetCor presented substantial evidence not only that the "fuel only" cards were coded to be limited to at-the-pump purchases, but that the restriction was effective in practice. *E.g.*, Appx1186-1187 (explaining over 2 million transactions

were declined as "invalid" non-fuel purchases).[13]   The district court relied on

anecdotal evidence of certain improper purchases using "fuel only" cards and an

internal training presentation describing "Fuel Only" as a "misnomer."[14]  Appx1657

(quoting Appx0592); *but see, e.g.*, Appx0913-0914 (FleetCor's response disputing

FTC evidence of customer complaints).  But that evidence simply creates a factual

dispute as to whether cards marketed as "fuel only" were limited to fuel-only

purchases.   At trial, FleetCor's witnesses could have explained the training

presentation, including that "Fuel Only" was not a precise descriptor because the

coding limited the *site* of purchase (at the pump) and cards could be re-coded to

remove the limitation upon request.  Appx0592, 1353.  Summary judgment was thus

unwarranted.

### 3.   The District Court Resolved a Factual Dispute About the Overall Impression of "Transaction Fees" (Count III).

The district court held that advertisements representing that fuel cards have

no "transaction fees" were misleading because FleetCor cards actually had

"transaction fees," *i.e.*, the Convenience Network Surcharge, Minimum Program

Administration, and High Risk fees.  Appx1663-1670.  The court thus resolved a

factual dispute over whether a reasonable FleetCor customer would understand those

---

[13] This portion of Wind's report was not excluded.  Appx1565.

[14] The presentation then explains how Mastercard products can be limited to at-the-pump purchases, corroborating FleetCor's testimony.  Appx0592.

charges to be "transaction fees." The court evidently assumed that a reasonable customer would understand a "transaction fee" to be *any* fee that was either labeled as a "transaction fee" or charged on a transactional basis. Appx1663-1667. But FleetCor presented substantial contrary evidence that should have precluded summary judgment.

Specifically, FleetCor presented evidence that customers would understand the phrase "no transaction fees," made in the context of a credit-card offer, to refer to the well-known fees that credit cards often charge on each purchase (often as a percentage of the purchase's value). *See Murray Space Shoe*, 304 F.2d at 272 (customers' net impressions define the representation at issue). FleetCor witnesses testified that "[a] transaction fee" would be understood to be a "fee charged by a company per every transaction (for the right to make the transaction)." Appx1230 (Chen Decl.); Appx1288 (Coan Depo.); Appx1331 (Panhans Depo.). Fees charged per transaction, for the right to use a credit card, are common. *E.g.*, *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 39 (2017) (merchant's "transaction fee to the credit card issuer" is sometimes "pass[ed] on" to customers).

FleetCor also presented evidence that a reasonable customer would not have understood the specific fees at issue to fall within the "no transaction fees" representation. The Convenience Network Surcharge was "a fee for out-of-network purchases (like an out of network ATM fee)," Appx0797 (Statement of Additional

52

Facts) (citing Appx1230-1231 (Chen Decl.)), charged for "the use of *select* sites/merchants" rather than for the right to use the card, Appx0438 (Terms & Conditions) (emphasis added).  Thus, it was a fee for the convenience of fueling at an out-of-network location where FleetCor did not enjoy preferential pricing, not for performing a transaction.  The Minimum Program Administration fee "applied in certain programs when fuel prices fall below a benchmark amount" to cover operational costs, and it could be charged per gallon rather than per transaction. Appx0797 (Statement of Additional Facts) (citing Appx1230-1231 (Chen Decl.)). Finally, High Risk (sometimes called "Level 2") pricing was not a *fee*.  It was a "a form of risk based pricing" for higher-risk customers.  Appx1230-1231.  Reasonable customers could have understood that each fee might apply consistent with the "no transaction fees" representation—for instance, an ATM card might not charge a transaction fee for the right to use the card, but might still charge for use of out-of-network ATMs.

For its part, the FTC argued only that the charges at issue qualified as transaction fees because they could sometimes be charged on a "per transaction" basis.  Appx1663-1664 (emphasis omitted).  In addition to being incorrect as to High Risk pricing, *see* Appx0798, the FTC never conducted a study on how customers might understand the phrase "transaction fees."  Appx1309 (FTC Depo.).  At trial, FleetCor could have made clear, through cross-examination, that the FTC had no

53

supporting evidence beyond its own opinion about what "transaction fees" means. The court's grant of summary judgment was legal error.[15]

**B.  Genuine Disputes of Material Fact Should Have Prevented Summary Judgment on the FTC's Unfairness Counts Related to Late Fees (Counts IV and V).**

In addition to the allegedly "unexpected" fees addressed in Part I above, Counts IV and V of the complaint also alleged that FleetCor engaged in "unfair practices" under Section 5 by charging its customers late fees for payments that were actually timely (Count V) and thus "without consent" (Count IV).  Appx1673.  In holding that the late fees were improperly charged in violation of Section 5, the court disregarded the fact that FleetCor overhauled its payment posting system in 2018 (by standardizing payment cut-off times and changing on-line bill payment vendors to improve service).  Issues resolved before the FTC filed its complaint cannot be the basis of an unfair-practice finding, much less an injunction.  And with respect to the remaining evidence, the district court improperly resolved numerous genuine factual disputes.

---

[15] The court's assessment of Count III also rests on factual misunderstandings.  For example, the court cited testimony about transaction fees charged to Comdata customers.  Appx1664.  But Comdata's fuel card program for truckers *does* charge transaction fees and *did not* advertise itself as having no transaction fees.

1. The evidence of allegedly improper late fees that the district court credited dated exclusively from 2018 and earlier, and therefore could establish FleetCor's practices only within that timeframe. Appx0488, 0605, 1677-1681.[16]

FleetCor presented evidence that in 2018, it overhauled its payment processing systems, with the result that charging fees erroneously was rare. FleetCor's new online payment system permits same-day payment posting, thus removing the source of potential mistaken late payments for those who pay online (the vast majority of FleetCor customers). Appx1204, 1241, 1386-1391, 1919, 1959-1960.[17] FleetCor also presented testimony as to its current practices: FleetCor does not charge late fees for on-time payments, whether by mail or online, and it processes payments on the day of receipt. Appx1238-1242, 1344. The district court discounted this testimony based on *past* errors, and dismissed it as being "based on no data." Appx1684. But there is no requirement that FleetCor provide empirical evidence—and indeed, the FTC also did not provide any empirical evidence on this point. Regardless, FleetCor also presented expert evidence demonstrating that, based on a survey of customer payments made primarily after the 2018 changes,

---

[16] The FTC's survey evidence was collected in 2020 and did not distinguish between customer recollections of asserted pre-2019 disputed late fee charges and subsequent charges. Appx0210, 1682.

[17] The online payment system also processes payments made by phone. Appx1959.

there were no delays in payment processing and those charged late fees had in fact paid late. Appx1190-1192; Appx1211-1214 (Wind Report).[18]

2. The district court did not acknowledge that the FTC's stale, pre-2019 evidence could not establish the existence of payment-posting delays after December 2019. That failure requires vacatur, for two independent reasons.

First, Section 13(b) of the FTC Act authorizes the Commission to file suit only against a party that it believes "is violating, or is about to violate, any provision of law" enforced by the FTC. 15 U.S.C. § 53(b). That language "unambiguous[ly]" permits the FTC to seek judicial relief only for "existing or impending" unfair acts. *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019). By contrast, if the FTC wishes to address since-discontinued practices, it must pursue an administrative action. 15 U.S.C. § 45(b) (permitting administrative proceeding when entity "has been or is using" an unfair practice). The FTC bore the burden of establishing its entitlement to seek relief under Section 13(b), yet it presented no evidence that the challenged late-fee conduct continued through the filing of the FTC's complaint—and FleetCor presented contrary evidence. The district court therefore erred in granting summary judgment to the FTC.

---

[18] Although portions of Wind's testimony were excluded, Appx1565, these opinions were not. Thus, the district court was wrong to conclude that FleetCor's testimony was not backed by empirical evidence. Appx1684.

Second, even assuming the FTC could properly challenge FleetCor's discontinued practices, the district court had an obligation to determine the *scope* of the violation established as a matter of law, and then to limit FleetCor's liability and any injunction accordingly. *DIRECTV*, 2018 WL 3911196, at *7-8; *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1122 (D. Nev. 2015). Instead, the court simply assumed that any purportedly unfair late-fee conduct had continued at least into 2019, Appx1677 (citing FTC's purported damages calculation based on payments into 2019), without considering whether FleetCor's evidence foreclosed that conclusion.

In sum, this Court should vacate the district court's summary-judgment ruling of liability with respect to all Counts and remand for further proceedings.

## III.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON MR. CLARKE'S PERSONAL LIABILITY.

Finally, even if this Court allows the liability ruling as to FleetCor to stand in whole or part, it should still find that the district court erred in holding Clarke personally liable.

1. An individual may be held personally liable for a corporation's violation of the FTC Act only if the individual had "some knowledge of the practices" and had authority to control them. *On Point*, 17 F.4th at 1083 (citation omitted). Only the knowledge requirement is at issue here. The district court applied the knowledge standard that this Court has used in an unpublished decision: the individual must

have had "actual knowledge of the [unlawful] conduct, [been] recklessly indifferent to its [unlawfulness], or had an awareness of a high probability of [unlawfulness] and intentionally avoided learning of the truth." Appx1726-1727 (quoting *FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017) (alterations in original)).

The Court need not decide the requisite level of knowledge in this case. Even under the district court's formulation, the FTC failed to present *any* evidence showing that, as a matter of law, Clarke had personal knowledge of, or was recklessly indifferent or willfully blind to, the allegedly unlawful challenged practices. The existence of knowledge is typically "a question of fact for the factfinder," and this case is not one of the "rare instances" where the factfinder can be bypassed. *Williams v. Obstfeld*, 314 F.3d 1270, 1277 (11th Cir. 2002).

2. Critically, it is the specific practices that the district court found unlawful of which Clarke must have knowledge to be individually liable. None of the evidence presented by the FTC and relied on by the court showed that Clarke had seen any of the ads in question, that he had any knowledge of FleetCor's since-remedied late fee issues, or that he was aware of the specific attributes of the disclosures that led the court to hold them unlawful. The evidence, as described below, fell far short of establishing knowledge—much less doing so as a matter of law.

At the outset, FleetCor presented evidence that laid bare the implausibility of the FTC's contention that Clarke had knowledge of the allegedly unfair and deceptive practices, and that should have at least created a factual dispute precluding summary judgment. As FleetCor demonstrated, Clarke is the President and CEO of a Fortune 1000 company with almost 10,000 employees operating multiple lines of business (of which fuel cards are one of many) in dozens of countries, and—as one would expect of someone in his position—he "was not personally involved in the details of how a fee would be disclosed to customers or the content of any advertisement." Appx0806.

Against that backdrop, the court relied exclusively on a smattering of emails sent to Clarke. Some of those emails had nothing to do with the practices at issue here. For instance, emails concerning whether customers paid more than the fuel-pump price in light of the minimum program administration fee, Appx0670-0671, 1727, were irrelevant because that fee had nothing to do with the gas-savings program that was the subject of the challenged advertisements. Appx1638-1655. Similarly, an email from Clarke expressing interest in obtaining more late-fee revenue, Appx1728-1729, had nothing to do with the payment-processing delays found unfair. *See* p. 17-18, *supra*. Thus, much of the evidence the court relied on was legally irrelevant.

The rest of the evidence was hotly disputed. Most importantly, much of the evidence tended to *exclude* not only knowledge, but reckless indifference and willful blindness. That is because, after receiving a short-seller report in 2017, Clarke took extensive steps to investigate and address the purported issues identified in the report: he asked FleetCor's general counsel to (1) "get [an] additional outside view on our compliance" and (2) "form a group to confirm that all of these things we're doing are compliant." Appx1283. Clarke also asked FleetCor employees "to look at everything, not just the legal stuff, but … make a better customer experience." Appx1284; *see also* Appx1338-1339 (describing significant corporate support for improvement efforts). When a person takes steps to remedy alleged unlawful conduct, he is neither recklessly indifferent nor willfully blind to it. *See generally FTC v. World Media Brokers*, 415 F.3d 758, 765 (7th Cir. 2005). It is common sense that "extensive efforts" or "good faith efforts" to respond to unlawful conduct "belie … reckless indifference." *Dominic v. DeVilbiss Air Power Co.*, 493 F.3d 968, 976 (8th Cir. 2007).

Much of the evidence showed just such good-faith efforts. For instance, one of the emails cited by the court, Appx0678, shows Clarke inquiring in early 2017 into FleetCor's fee-disclosure practices in response to the short-seller report, and after receiving information, Appx1728-1729, Clarke directed FleetCor staff to undertake a thorough inquiry. Similarly, the report itself, Appx1729-1730, could

60

not give Clarke knowledge of unlawful practices, as he testified that in response, he directed FleetCor's general counsel to ensure that FleetCor complied with applicable laws. Appx0623-0627, 0672-0676, 1283.

The remaining evidence was susceptible to multiple inferences, and therefore could not establish as a matter of law that Clarke had the requisite knowledge. A presentation and emails that described customer complaints and asserted that some customers left FleetCor because fees were "too high, unexpected, [and/or] incorrect," Appx1729, merely described common customer complaints that need not be associated with any unlawful or deceptive practices. And an email stating that small and medium-sized businesses received "minimal/no SMB rebates since the beginning of 2015," Appx1728 (citation omitted), had to be considered in light of the fact that Clarke had *also* received information that customers were seeing savings, Appx0670-0671.

Moreover, much of the evidence shows Clarke soliciting information from *others* after publication of the short-seller report, which demonstrates a lack of knowledge as to FleetCor's specific practices. *See, e.g.*, Appx0680, 0704. Indeed, in one email regarding fee disclosures Clarke asked "'Who' decides on these policies Below ?," Appx0603, confirming that the particulars of FleetCor's fee disclosures were a matter well below his pay grade.

That is the sum total of the evidence presented by the FTC and relied upon by the court. None of it even begins to suggest that Clarke had actual knowledge of any purportedly unfair or deceptive practices, or even that he was recklessly indifferent or willfully blind. Indeed, much of the evidence demonstrates that Clarke could not have had the requisite mental state—to the contrary, he took steps to investigate and address the allegations of which he learned.

At a bare minimum, factual disputes should have precluded summary judgment against Clarke.

## CONCLUSION

This Court should vacate the order granting summary judgment to the FTC with respect to FleetCor's and Clarke's liability. At minimum, it should vacate the Express Informed Consent provisions of the permanent injunction.

Date: November 15, 2023                 Respectfully submitted,

                                        s/ Donald B. Verrilli, Jr.

Noel J. Francisco                       Donald B. Verrilli, Jr.
Hashim M. Mooppan                       Ginger D. Anders
JONES DAY                               Andra Lim
51 Louisiana Ave. NW                    J. Kain Day
Washington, DC 20001                    MUNGER, TOLLES & OLSON LLP
(202) 879-3939                          601 Massachusetts Ave. NW
njfrancisco@jonesday.com                  Suite 500E
hmmooppan@jonesday.com                  Washington, DC 20001
                                        (202) 220-1100
                                        Donald.Verrilli@mto.com
                                        Ginger.Anders@mto.com

                    *Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE**

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,968 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman.

Date: November 15, 2023

Respectfully submitted,

s/ Donald B. Verrilli, Jr.

Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. All participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


Date: November 15, 2023                    Respectfully submitted,

                                           s/ Donald B. Verrilli, Jr.
                                           Donald B. Verrilli, Jr.