**FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

---

No. 23-12539

---

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

*versus*

CORPAY, INC.,
RONALD CLARKE,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-05727-AT

---

Before ROSENBAUM, LAGOA, and WILSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

Great Britain has an expression: "All fur coat and no knickers." In the United States, we might say instead, "All hat and no

cowboy." Either way, we'd mean all talk and no substance, or something looks much better than it really is.

And that's what the Federal Trade Commission ("FTC") thought about Corpay, Inc.'s promises to its customers.[1] For years, Corpay marketed itself as offering large and small businesses fuel credit cards that promised savings, control, and transparency. Yet when the FTC looked under the hat, it found no cowboy. Beneath Corpay's promises of big savings, the FTC alleged, stood hidden charges, misleading practices, and broken commitments.

So the FTC filed an enforcement action against Corpay and its CEO Ronald Clarke. After granting summary judgment for the FTC against both Corpay and Clarke, the court also entered permanent injunctive relief against Corpay. Among other things, that injunction prohibits Corpay from putting fee disclosures behind a hyperlink, requires the company to make the disclosures "unavoidable," and mandates that Corpay secure a separate assent for each fee it charges.

Corpay now appeals the district court's entry of summary judgment and the permanent injunction against it and Clarke. It argues that genuine disputes of material fact preclude summary judgment. And even if liability stands, Corpay asserts, the district

[1] FleetCor Technologies, Inc., rebranded and changed its name to Corpay, Inc., in March 2024. The district-court decision and all filings in this case refer to Corpay as "FleetCor." But because of the name change, we refer to it as "Corpay."

court exceeded its equitable authority by issuing an overly broad injunction.

After reviewing the record and the parties' briefs, and with the benefit of oral argument, we mostly disagree. The evidence against Corpay is overwhelming, and the company has not created a genuine dispute of material fact to preclude summary judgment against it. The evidence is similarly damning against Clarke on four of the five counts. But on one count, we agree with Clarke that the FTC has failed to establish that he had "some knowledge" of the company's illegal conduct to support summary judgment. As for the injunction, we conclude that the district court didn't abuse its discretion in issuing that relief.

So we affirm the grant of summary judgment against Corpay on all five counts of the FTC's complaint. And we affirm the grant of a permanent injunction against Corpay. We also affirm the grant of summary judgment on four counts against Clarke. But we vacate the grant of summary judgment against Clarke on Count II and remand for further proceedings on that claim. Finally, we affirm the remainder of the district court's judgment, including the permanent injunction.

## I. BACKGROUND

### *A. Factual Background*

Corpay is a publicly traded company headquartered in Atlanta, Georgia. Ronald Clarke has served as Corpay's CEO since at least 2014.

Corpay's core products are "fuel cards," limited-use credit cards for fuel purchases, designed for businesses that use vehicles. Corpay advertises that these cards "provide a range of benefits, including spending reports, a replacement for cumbersome reimbursement systems, methods for tracking fuel economy, and access to credit."

According to Corpay, it has over 200,000 business customers and 8,000 employees. Some of Corpay's largest customers are highly sophisticated companies, including FedEx, UPS, Coca-Cola, Pepsi, Lowe's, and Sysco. But Corpay's primary customer base, that is, 90–95% of its customers, includes small- and medium-sized businesses. So it's unsurprising that around 75% of Corpay's customers have 10 or fewer Corpay cards and 83% have credit limits of $20,000 or less. In fact, Corpay's new-hire materials recognize that customers are often small business owners . . . who "work in the field/drive[] vehicles" and "do[n't] think of them[selves] as having a 'fleet'"; are "not always in front of a computer"; and are "short on time due to wearing multiple 'hats.'"

Corpay offers many types of fuel cards, but three kinds are relevant for this case: (1) Fuelman cards, (2) Mastercard cards, and (3) co-branded cards. Independent merchants that directly contract to be in Corpay's "Fuelman Network" receive Fuelman cards. Customers may use Corpay's Mastercard cards at fuel and maintenance locations that accept Mastercard. And customers may use the co-branded cards, which Corpay operates in partnership with major

fuel providers like BP, Speedway, and Arco, on either the Fuelman or the Mastercard network.

On December 20, 2019, the FTC brought an action in the Northern District of Georgia against Corpay and its CEO Clarke. The FTC alleged they committed five violations of Section 5 of the FTC Act, 15 U.S.C. § 45. Counts I through III asserted three kinds of deceptive advertising. First, the FTC alleged Corpay created ads that falsely promised discounts "per gallon" of fuel when the customer used some of Corpay's Fuelman Network and Mastercard cards. Second, the FTC asserted that a set of Corpay's ads for its Mastercards falsely claimed that customers could limit purchases on those cards for "fuel only." And third, the FTC complained that Corpay's advertisements for both its Fuelman Network and Mastercard cards falsely represented that they had no transaction fees.

Count V of the FTC's complaint alleged Corpay engaged in "unfair practices" by charging unauthorized, unexpected add-on and late fees to its customers. For its part, Count IV asserted that Corpay made false and deceptive representations by indicating on billing statements that customers owed these allegedly unlawful fees. So Counts IV and V jointly centered on one set of conduct.

The parties both moved for summary judgment in 2021. We discuss the evidence against Corpay and Clarke specifically at the time the district court ruled on the motions.

1. <u>Count I: "Per Gallon" Advertisements</u>

The first set of advertisements that the FTC challenged claimed that four of Corpay's cards offer savings for each gallon of

fuel purchased with them. The content of these ads is not in dispute, but the wording varies slightly between ads.

First up, we have the Fuelman Discount Advantage card. Ads for that card generally promised that customers would "[e]arn 5¢ cash back per gallon" or "[e]arn 5¢ cash back with the Discount Advantage FleetCard!" Here's a representative advertisement for this card:




FLT_FTC00000998

Second, Corpay offered the Fuelman Diesel Platinum card.

Ads for that one generally promised that consumers would "[s]ave 10¢ per gallon on diesel fuel." This next image displays a typical ad for this card.




FLT_FTC00000121

Third, the company offered the Fuelman Commercial Platinum card. Those ads generally represented that the card "offer[ed] a 5¢ per gallon discount on both unleaded and diesel fuel." And they highlighted that consumers "[s]ave[d] 5¢ per gallon on unleaded and diesel fuel everyday, from gallon one, with no caps on total savings." Plus, the Fuelman Commercial Platinum card promoted an additional 3¢-, 4¢-, or 15¢-per-gallon savings for the first three months. Here's an image of a typical ad for this card:




Finally, Corpay promoted the Universal Premium Mastercard. Those ads promised that the customer would "[s]ave up to

6¢ per gallon wherever Mastercard is accepted." A representative ad for that card appears below.




FLT_FTC00000050

As the images above show, for almost all the ads, the company displayed the savings promotion in prominent, central text.

But often they followed the text with an asterisk. This asterisk marked a fine, tiny-print disclosure at the bottom of the ad containing several caveats to the discount. And these caveats often operated in practice to negate or significantly decrease any promised benefits.

To show what we mean, consider one of Corpay's ads promoting 5¢-per-gallon savings. The ad promised that the card was "conveniently accepted at 40,000 fuel sites in the Fuelman Network: . . . [and] across 6 major national brands, including Chevron, Texaco, Loves, Pilot, Sinclair, and ARCO." But in fine print at the bottom of the same ad, the disclaimer contradicted much of the promised savings by capping them and by narrowing the network both substantially and indefinitely:

> Rebates credited to account statement quarterly, and limited to 2,000 gallons per quarter. Rebates are subject to forfeiture for inactivity or late payment behavior during the quarter. Discount does not apply to gallons pumped at the Convenience Network of Chevron, Texaco, Loves, Pilot, Sinclair, and ARCO. Convenience Network is subject to change without notice.

So the very brands the ad highlighted as available for use were the same ones where no discount applied. This kind of fine-print reversal was typical of Corpay's rebate promotions.

Another ad offered up to 6¢-per-gallon discounts anywhere that accepted Mastercard. But what the ad promised to give, the disclaimer took away much of:

> *Earn up to 6¢ per gallon in rebates from a combination of 3¢ per gallon within the Fuelman Discount Network and up to 3¢ per gallon in volume rebates. Purchases must be made with the Universal Premium FleetCard MasterCard and the account must be in good standing. Not valid on aviation, bulk fuel, propane or natural gas purchases. Volume rebates are based on the number of gallons purchased monthly and will be calculated on the gallons pumped at Level 3 sites . . . . The Fuelman Discount Network is a selected group of fuel locations that allow cardholders additional savings. For a list of participating sites, visit www.fuelmandiscountnetwork.com.

So under the disclaimer, the discount applied at only those merchants who entered the Fuelman Discount Network rather than all who accepted Mastercard. And the fine text also warned that Corpay would limit the rebates to accounts in good standing. But it never defined the term. And as we explain later, that turned

out to be a bit of a black hole. This limitation was typical of the disclaimers. The disclaimer similarly failed to explain what "Level 3 sites" were, even while it said that Corpay would calculate half the rebate based on purchases at such locations.

And though the FTC presented an expert witness who agreed that companies can modify rebates if they fully disclose changes, notably missing from these and most (but not all) disclaimers was any indication that Corpay reserved the right to change the discount program at any point.

Still, some ads directed consumers to consult terms and conditions to learn more. And these terms and conditions allowed the company to change or decrease its rebates. Corpay's expert also opined that the substance of the company's limitations on its rebates was consistent with common industry practices.

In the end, because of all these constrictions, customers ended up with discounts that were substantially lower than the top-line value Corpay appeared to promise. According to the FTC's data analyst, the following chart represents the advertised discount versus the average actual discount customers received:

| Product | Advertised Discount Per Gallon | Average Actual Discount Per Gallon |
|---|---|---|
| Fuelman Diesel Platinum – 2016 | 10¢ | 6¢ |
| Fuelman Diesel Platinum – 2017-2019 | 8¢ | 6¢ |
| Fuelman Commercial Platinum | 5¢ | 3¢ |
| Fuelman Discount Advantage | 5¢ | 0.1¢ |
| Universal Premium Mastercard | 6¢ | 1¢ |

Plus, it's undisputed that Corpay "turned off per gallon discounts (1) after customers had been using [Corpay] services for some period of time, e.g., 6 months or 12 months, or (2) if customers did not purchase a certain number of gallons." So customers lost even the significantly reduced benefits.

In fact, in a 2017 email to CEO Clarke, Corpay's Head of Sales admitted as much. He said that "[f]undamentally [Corpay has] had minimal/no [small-to-medium sized business] rebates since the beginning of 2015." And internal customer surveys noted that some consumers had complained about not receiving sufficient discounts. Still, in a survey that Corpay's expert witness conducted, fewer than 2% of customers in 2020 complained of discounts.

2. <u>Count II: "Fuel Only" Ads</u>

The second set of ads at issue claimed that customers could limit purchases on Corpay Mastercards to "Fuel Only." And it's undisputed that in its promotional materials, Corpay advertised these

cards as "Fuel Only." These cards contrasted with those that Corpay labeled maintenance only; fuel and maintenance only; and materials, fuel, and maintenance.

But Corpay knew its "Fuel Only" representation was false. A slide in Corpay's new-hire materials referred to "Fuel Only" as a "misnomer." It noted that Corpay could limit its Mastercard to only purchases at fuel sites but not to specific products. And while "Fuel Only" cards were limited to one purchase per fuel site by default, that purchase could be for things other than fuel, like "snacks, beer, etc." "[F]or even more security," the slide continued, "Fuel Only" cards could be "further limit[ed] . . . to purchasing at fuel islands."

Despite this evidence, a Corpay representative testified that "Fuel Only" cards were limited to "at the pump" purchases. Yet Corpay's expert conceded that Corpay couldn't limit all non-fuel purchases on "Fuel Only" cards. Still, the expert noted, Corpay was able to stop more than 2 million transactions through fraud alerts for nonfuel purchases.

Even so, at least some customers complained that employees used their Fuel Only cards for nonfuel purchases. In one of the more dramatic examples, a customer complained of $208,688.05 in purchases of Safeway gift cards on its "Fuel Only" card. And Corpay's own expert concluded that 3% of all transactions and 10% of in-store transactions on "Fuel Only" cards were on purchases other than fuel.

3. Count III: "No Transaction Fees" Ads

The third set of challenged advertisements boasted that Corpay cards had "no transaction fees." But in fact, Corpay charged three fees under certain conditions per transaction or per gallon of fuel. These fees included the Convenience Network Surcharge, the Minimum Program Administration Fee, and Level 2/High Risk Pricing.

First, the Convenience Network Surcharge, as Corpay's Terms and Conditions described it, was a fee of up to the greater of 10¢ per gallon or $2.50 per transaction "for the use of select sites/merchants." Corpay's Terms and Conditions didn't identify or define these "sites," though. Internal company documents from August 2019 referred to this fee as the "Convenience Trx Fee" and the "CDN Tran Fee." And in a deposition, Corpay's Senior Vice President for Revenue Management referred to the Surcharge as a "transaction fee." In a declaration, though, that same Senior Vice President said the Surcharge was not a transaction fee but an "out-of-network" fee like ATMs or healthcare companies charge.

Second, the Minimum Program Administration Fee referred, under Corpay's Terms and Conditions, to a 10¢-per-gallon or $2.00-per-transaction fee that Corpay could charge when the previous month's average fuel price fell below $3.25 per gallon. August 2019 internal documents said Corpay was charging existing but not new customers at 10¢ per gallon. And the Senior Vice President for Revenue Management confirmed that until 2018, Corpay applied this fee to accounts on a per-gallon basis.

Finally, Corpay had what it euphemistically referred to as "Level 2 Pricing." In its internal documents, Corpay more candidly described "Level 2 Pricing" as "High Risk Fees." Under Corpay's Terms and Conditions, Level 2 Pricing was an incremental charge it applied to transactions for those it deemed "High Risk" customers, with a maximum of 20¢ per gallon. The August 2019 internal documents assessed the fee for Fuelman Network cards at 20¢ to 30¢ per gallon, depending on the customer's risk profile and for Mastercard cards at $3 for medium risk and $4 for high risk "per trx."

Under the Terms and Conditions, "High Risk" meant all customers who (1) had a credit score below a certain level (520 or lower for commercial scores, or 660 or lower for individual score); (2) had a credit score that dropped 51 points or more in a 3-month period; (3) were assessed more than one late fee in a 12-month period; (4) made a payment that the customer's bank did not honor; *or* (5) "*operate[d] in the trucking or transportation industry.*" Of course, given the fuel cards' purpose, many of Corpay's customers "operate[d] in the trucking or transportation industry." So imposition of these fees was not rare.

In a deposition, Corpay's Senior Vice President for Revenue Management referred to the Level 2 Pricing as a "transaction fee." Later, though, in her declaration, she swore that it was not a fee but "risk-based pricing." Meanwhile, in internal emails, Corpay instructed its customer service representatives to avoid the term "High Risk" and instead use "Transaction Fee."

In response to this evidence, Corpay stresses that some of its witnesses understood the term "transaction fee" to be a fee assessed once for "every" transaction. And because Corpay doesn't uniformly apply these three fees to every transaction, Corpay reasons, it does not consider them to be "transaction fees."

4. Counts IV and V: Unauthorized Fees

In addition to the advertisements, the FTC challenged Corpay's billing customers for seven "unexpected fees." We've already discussed three of these (the Convenience Network Surcharge, Minimum Program Administration Fee, and High Risk Fees). As for the four other fees, they included FleetAdvance and FleetDash, Fraud Protector, Accelerator Rewards, and the Clean Advantage Program.

Corpay's internal documents defined FleetAdvance & FleetDash as a $29.97 monthly charge. Corpay assessed Fraud Protector as a charge of $3 per month per card (with a maximum charge of $300 per month) for accounts that had at least 10 cards and $15 per month per account for customers with 9 or fewer cards. For Accelerator Rewards, Corpay charged customers $4 per month per card. Corpay enrolled customers by default in all three of these fees unless they opted out after a 60-day free trial.

An internal email confirms Corpay similarly automatically enrolled customers in the Clean Advantage Program. That was a 5¢-per-gallon charge to "offset" emissions from fuel purchased. Corpay billed this charge to existing customers who had been with the company since at least 2018. But the company did send out a

notice mailer to customers at the beginning of free trials for Clean Advantage, Fraud Protector, and Accelerator Rewards.

Still, the FTC uncovered evidence that Corpay didn't make customers aware of these fees in advance. Internal emails and customer complaints showed that Corpay did not mention these fees to customers during the sales process. And a telephonic survey that the FTC's expert conducted of Corpay's customers who were assessed the eight fees revealed that the company informed just 7.02% of customers of all fees before charging them. That survey produced the following data:[2]

| Fee Name | Percent of Corpay Customers That Were Charged Where an Agreement Signer or Update Receiver Was Informed About the Fee in Advance |
|---|---|
| Minimum Program Administration Fee | 19.15 % |
| Level 2 Pricing or High Credit Risk Fee | 11.39 % |
| Convenience Network Surcharge | 30.43% |
| Fleet Dash | 16.13% |
| Clean Advantage | 6.25% |
| Accelerator Rewards | 21.74% |

[2] Corpay's experts disputed the methodology of this survey. They complain participants were asked to remember information they likely could have forgotten, were not given an explicit option to say they did not remember the answer, were asked "biased" questions, were informed the survey was being conducted for the FTC, and were paid $100 for participation.

| | |
|---|---|
| Fraud Protector | 14.00% |

Three of the fees (Fraud Protector, Accelerator Rewards, and Clean Advantage) did not appear in past Corpay Terms and Conditions. The rest were in the Terms and Conditions. Even so, Corpay made the document largely inaccessible to customers. From 2014 to 2017, Corpay did not post the Terms and Conditions online. Instead, it mailed a hard copy to customers after they signed up for a card. And internal emails directed employees not to provide an electronic copy to customers.

The company also made the Terms and Conditions difficult to read. It printed the document, which contains many provisions, in tiny, fine-print text. Indeed, the version Corpay provided to customers was so unreadable that employees had their own "read friendly" alternative.

Besides these deficiencies, the FTC uncovered evidence that Corpay did not identify fees it charged on its billing statements. Invoices stated only a total sum of charges the customer owed to the company.

In the best-case scenario, to find itemized fees, customers had to look at a separate document: "the Fuel Management Report." This practice so tended to effectively hide the charges that, on one occasion in March 2016, Corpay employees sent panicked emails when a fee was included on an invoice instead of the Fuel Management Report.

Even worse, according to another employee email, before September 2017, the company didn't even disclose some charges like the High Risk Fee on the Report. Customers could discover the upcharge only by comparing their fuel receipts to their Corpay invoice.

Internal surveys also reported that Corpay noted fees on the Report without specific labels, instead using identifiers like "Misc." The FTC's telephonic survey found that only 25.23% of Corpay's customers saw fees charged on either their invoice or Fuel Management Reports. And to top it off, Corpay knew that its customers were confused and surprised by its fee practices. Eight internal surveys from 2016–2020 told them so. In the most recent survey, dated February 2020, the company found that 38% of customers cited fees as the top reason for leaving, with 55% of them pointing to the FleetAdvance fee.

In response to this evidence, Corpay offered its own testimony.

First, one of its experts determined that the amount of fuel customers purchased did not change when Corpay disclosed a fee on the Fuel Management Report (but of course, that was not in the invoice).

Second, several of the company's executives asserted in testimony that Corpay had a practice of disclosing fees to customers before charging them.

Third, Corpay introduced evidence that it made changes after the FTC advised Corpay of its concerns. "Following the FTC's

allegations in this case, [Corpay said, it] sent revised and enhanced Terms and Conditions to its existing customers." These changes included "[r]edesign[ing] its Terms & Conditions with a prominent fee box up front and simplified language," "[s]en[ding] the redesigned Terms & Conditions to its customer base," and seeking "approval from its customer base for these redesigned Terms & Conditions."

For instance, in October 2019, two months before the FTC filed its complaint, Corpay rolled out the new Terms and Conditions with a prominent fee box for new customers. These new Terms and Conditions included previously undisclosed fees like Clean Advantage Program, Fraud Protector, and Accelerator Rewards, and it described them as "Program Fees."

Then, at some point unclear from the record, Corpay obtained renewed consent from existing customers. Corpay sent its customers an online pop up, which notified the user of new Terms and Conditions. That popup presented a hyperlink to see the Terms and Conditions and asked them to click "I agree." The popup also told the user that the Terms and Conditions had information on the "fees" on the account. According to an analysis by Corpay's expert, by October 2020 (ten months after the FTC's complaint), 81% of customers had accepted the new terms and conditions.[3] Still, 18.8% (19,146 out of 101,472 active accounts) had not responded to the popup. And Corpay did not discontinue service

[3] By June 30, 2020, this figure was only about 69%.

to nonresponsive accounts. Only 133 accounts declined the popup, and 70 accounts asked for revised Terms and Conditions.

Corpay referred to this effort as the "Express Informed Consent Project." In one internal slide, Corpay explained its reasons for the Express Informed Consent Project: "The FTC alleges that [Corpay's] terms and conditions are insufficient, and in particular fail to fully disclose certain fees. We disagree with the FTC's allegations, but took the opportunity to improve our terms and conditions."

5. Counts IV and V: Erroneous Late Fees

The FTC also alleged Corpay charged its customers late fees for timely payments. Based on Corpay's transaction data, the FTC put the amount Corpay collected from unfair late-fee practices at $213 million in unlawful fees. The FTC corroborated its allegations with Corpay's internal communications, internal studies, employee testimony, and even Corpay's own commissioned study.

We start with the internal communications. Several show Corpay improperly assessed late fees.

For example, a November 2017 email from the Senior Vice President of Product and Growth described erroneous late fees as a "massive problem." And a chat between two supervisors in customer service included the comment that customers "can't set up online bill pay, Checkfree doesn't work half the time[.] And heave[n] forbid you mail a check. . . ."

Plus, some evidence suggested these failures were intentional. In a 2017 email, for instance, CEO Clarke asked employees for "opportunities to get more late fee revenue in 2018 . . . thru a higher rate, less/no grace days, etc, etc." Along these same lines, a former Corpay Revenue Analyst testified that the Vice President of Revenue Management told her that Corpay didn't make it easy for customers to pay electronically because doing so would reduce late-fee revenue.

Even after Corpay implemented online payment systems, internal communications revealed that it still had delays in payment postings. In particular, "payments made on weekdays post[ed] on the next business day, and payments made on weekdays after 5:00 p.m., on weekends, or on holidays post[ing] two business days after payment[.]"

Several internal studies from 2017 and 2018 also found that customers complained of erroneous late fees. For example, one 2018 internal customer survey found that customers felt "[l]ate fees [are] charged even when a [Corpay] technical error prevents customer on time payment." And a January 2017 "Customer Risk Assessment" acknowledged "erroneous late fees." It also identified the reasons as "(1) 'Check Free payment posting error in Aug. resulted in payments not getting applied to accounts;' (2) 'EFT [Electronic Funds Transfer] processing . . . delayed causing accounts to lock [recurring];' (3) 'Check By Phone constant processing delay preventing timely application of payments;' and (4) 'Lockbox processing delay or perception.'" Several customers also complained

of improperly assessed late fees, including through online payment systems.

In an affidavit, Corpay's treasurer acknowledged that Corpay previously could not post online payments within 24 hours. But the company instructed customers to pay by phone for quicker payments. And he insisted the Terms and Conditions and the online-payment portal contained information on these cutoffs.

The treasurer also explained the company's process for payments customers made by mail. He testified that Corpay credited "conforming" payments it received by 4:00 p.m. that day. And he said that payments "almost never arrive" after 4:00 p.m. Payments are "nonconforming" if they're not in the proper envelope or the envelope contains more than a payment slip and check. Corpay says requiring conforming payments allows for automatic processing of payments, and Corpay advises customers that non-conforming payments result in delays. The Senior Vice President of Product and Growth also testified that postal slowdowns caused any delays in posting payments by mail.

Still, the FTC's telephonic survey found that Corpay charged 37.90% of its customers late fees even though they paid their bills on time. Corpay takes issue with that statistic. Its expert found that only 7.44% of customer complaints were about the issues the FTC identified in its complaint, including late fees. That expert also found that only between 9 and 14% of invoices were paid late between April 2016 and May 2019. And of those that were late, less

than 2% were late by only one day and 57.1% were late by five or more days.

More recently, in October 2018, Corpay announced the launch of a new online-payment portal. Corpay's treasurer explained the company contracted with another online-portal provider, which could do same-day online payments. He claimed that now, Corpay credits online payments made by 5:00 p.m.[4]

Corpay also complains that the FTC's telephonic survey included customers who claimed disputed late-fee charges from before 2019, the first full year with the online portal. But even one of Corpay's experts analyzed a random sample of 400 payments made through the new online portal and uncovered 33 late full payments, including eleven—a full third of the payments designated "late"—that were paid timely. Of those 33, five were submitted after 4 p.m. the day they were due, six were submitted after 4 p.m. the Friday before the Sunday they were due, and 22 were submitted after their due date. That same expert found that Corpay credited "conforming" mailed checks to customers' accounts the day they were deposited. As for "nonconforming" checks, which made up just 0.8% of the sample, Corpay credited them the next day.

[4] In Corpay's reply brief, the company acknowledges its cutoff as 4:00 p.m. ET, not 5:00 p.m. Corpay's expert also cited 4:00 p.m. ET as the cutoff.

6. Ronald Clarke's Conduct

Besides charging Corpay, the FTC alleged that Corpay's CEO Ronald Clarke was personally liable for the company's conduct.

Throughout the alleged conduct and to the present, Clarke has served as Corpay's CEO, President, and Chairman of the Board. As the district court explained, he "makes and supervises company policy and is the 'ultimate decision-maker,' 'along with the board' . . . ." Clarke is also "ultimately responsible" for Corpay's "day-to-day decisions" and "pays 'close attention' to [Corpay's] fuel card business." All Corpay's employees report to him.

The FTC presented evidence that Clarke had direct knowledge of Corpay's charged conduct. As the district court summarized, this evidence included the following: "(1) a volume of email communications between Clarke and his subordinates; (2) warnings from shareholders and partners; (3) customer complaints to [Corpay] and the Better Business Bureau; (4) public reports; (5) internal studies with respect to marketing, fees, and customer attrition; and (6) Clarke's general degree of involvement discussing the practices at issue."

Several emails showed Clarke had knowledge of the company's marketing and fee-disclosure processes. In one exchange, a subordinate told Clarke that customers often paid *more* than the pump price of fuel despite per-gallon savings promised. In another noteworthy exchange, Clarke asked his Head of Sales whether

"there was 'a mechanism' . . . that 'forfeits customer discounts.'" The Head of Sales replied, "We added that language in early 2015 and used it as a basis to remove SMB [MasterCard] volume rebates. Fundamentally we have had minimal/no SMB rebates since the beginning of 2015."

Another time, Clarke asked what notification a customer receives when Corpay bills them for a fee for the first time. His Head of Sales responded, "None. Other than a T&C change." He continued, explaining that when the terms and conditions allowed charging a higher rate, Corpay offered no other notice for an increased fee rate.

And as for late fees, in December 2017, Clarke asked if there were "opportunities to get more late fee revenue in 2018 . . . thru a higher rate, less/no grace days, etc, etc."

Clarke also received information on customer complaints about discounts and fee practices through subordinates, shareholders, and corporate partners.

Besides the information he obtained from these individuals, Clarke was in the direct decision-making process for some of the fees. For example, "Clarke approved the decision to implement the Minimum Program Administration Fee and the subsequent decision to increase the amount of that fee." Still, he testified he didn't know the specifics of how the fee would be implemented.

Clarke also received and acknowledged public reports criticizing Corpay's business practices. In March 2017, he got an email telling him "[a]nother report just published," with the report

attached. Clarke answered, "Here we go again! This article seems particularly stupid to me." That report contained information on multiple Better Business Bureau complaints about fees. In response, Clarke instructed subordinates to fix it "just like we did last time." And in an investors' call in May 2017, Clarke described public reports on the company's fees, billing practices, and customer service as "fake news and exaggerations."

But Clarke testified that after the articles, he formed groups to ensure Corpay's compliance with applicable laws and improve customer experience. And the Senior Vice President of Product and Growth testified that Clarke "approve[d] [the] customer experience initiative work."

### *B. Procedural Background*

On December 20, 2019, the FTC filed its complaint against Corpay under 15 U.S.C. § 53(b). It alleged that Corpay and Clarke violated 15 U.S.C. § 45(a) in several ways. In particular, the FTC alleged three counts of deceptive advertising (based on Corpay's "per gallon," "fuel only," and "no transaction fees" ads). It also pressed one count of unfair fee and billing practices for charging, without express, informed consent, the seven fees we've discussed, as well as late fees. And it charged one count of deceptive billing practices for representing to customers that they owed these fees. The FTC sought both injunctive and equitable monetary relief.

#### 1. The Summary-judgment Order

In 2021, the FTC moved for summary judgment on all five counts. Corpay also moved for summary judgment, asserting that

the FTC cannot obtain monetary relief or permanent injunctive relief. Because the Supreme Court in *AMG Capital Management, LLC v. FTC*, 593 U.S. 67, 82 (2021), held that 15 U.S.C. § 53(b) does not authorize equitable monetary relief, the district court granted Corpay's motion as to monetary relief.

The court also granted summary judgment to the FTC on all five counts against both Corpay and Clarke. Construing all genuine disputes of material fact in favor of Corpay, the court concluded for the first three counts as to all challenged ads that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material."

And the court recognized that the remaining two counts about fee practices "r[o]se[] [or] f[e]ll[]" together. As to the unfair-fees count, the court granted summary judgment because it concluded Corpay's fee practices "(1) . . . cause or are likely to cause substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by any countervailing benefits to consumers or competition." Then the court applied the same test to Corpay's billing statements that it used to evaluate the challenged ads in Counts I through III. After doing so, the court granted summary judgment on the final count.

As for Clarke's personal liability, the court held that Clarke had not shown a genuine dispute that he had "authority to control" Corpay's actions and "some knowledge of the practices" challenged. So the court granted summary judgment to the FTC.

Next, the district court considered whether permanent injunctive relief was appropriate. As the court explained, that relief was appropriate if "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." And on this record, the court found that "the mountain of evidence presented by the FTC demonstrates that [Corpay's] violations were far-reaching." The court also determined that Corpay's "deceptive advertising and unfair fee practices were ingrained in the fabric of the company for years." And, the court said, "there is unrefuted evidence in the record that the conduct was intentional — and that it came straight from the top."

Beyond these considerations, the court found "that Defendants have in no way 'recogni[zed] the wrongful nature of their conduct' and, as the business is still fully operational, the 'occupation' surely 'present[s] opportunities for future violations.'"

But the court didn't stop with Corpay's past conduct and the possibility of future violations. Rather, it found that "there is demonstrable record evidence — contrary to Defendants' emphatic position — that [Corpay]'s unfair practices persist."

In support, the court cited Corpay's "own internal study **from 2020**" of customer dissatisfaction with fees. The court also noted that Corpay "ha[d] not provided any evidence that it has implemented an affirmative disclosure process or that it does not automatically opt customers in to fees for 'programs' they have not requested." As for the advertisements, the court noted that "the specific advertisements at issue . . . are no longer circulated." But

even so, the court continued, "such voluntary cessation is not adequate to protect against future violations where [Corpay] is easily able to put forth similar ads anew." And overall, the court reasoned, "because the harm involved small amounts [of] losses spread to many people, the public interest in enjoining future conduct is further increased."

In sum, the district court found "though some of [Corpay]'s unlawful practices have ceased, others continue and, further, [Corpay]'s past repetitive 'conduct indicates that there is a reasonable likelihood of further violations in the future.'" So the district court denied Corpay's motion for summary judgment as to injunctive relief. Instead, the court determined "some form of permanent injunctive relief is appropriate[.]"

2. Remedial Proceedings

Still, the court concluded that the "specific scope" of that "relief require[d] additional consideration." To determine the appropriate scope, the court held an evidentiary hearing.

At the hearing, Corpay explained that it reformed its disclosures in advertisements**.** It said that its disclosures now had clarifying language in the same font, on the same page or medium, as its advertised claim. The company also insisted it no longer advertises "fuel only" and "no transaction fees" cards and has generally cleaned up advertisements. But the FTC maintained that Corpay's ads continued to promote "per-gallon savings with fine-print footnotes."

As for its billing practices, Corpay said that under its post-2018 reformed payment system, now 85% of customers pay online, 8% pay by phone, and 7% pay by mail. Corpay also represented that since 2020, it has reformed its product offerings to center around "packages" (regular, plus, and premium) at different monthly price points. These "packages," Corpay explained, replace most of the challenged add-on fees for new customers. So since 2020, Corpay asserted, it has not separately charged new customers for FleetDash, Accelerator Rewards, Fraud Protector, and the Convenience Network Surcharge. Since 2020, Clean Advantage has also been a separate product that customers can purchase. And since 2017, new customers have not been subject to the "minimum program fee."

Still, Corpay continues to assess new customers the "high risk fee" if they make late payments or have low credit scores. And Corpay notifies these customers of the high-risk fee through only the Fleet Management Report.

Plus, Corpay's pre-2020 existing customers are still enrolled in and charged their separate fees under the old model. At the time of the hearing (October 2022), those pre-2020 customers made up about 65 to 70% of Corpay's customers.

Corpay justified its continued assessment of those fees based on its Express Informed Consent Project. Under that Project, Corpay said, by October 2022, 96% of its pre-2020 customers had affirmatively consented to the new terms and conditions. Corpay also claimed it modeled its new hyperlinked-terms-and-conditions

structure after the practices of companies like Bank of America and Capital One.

The FTC took issue with Corpay's justification of its fees. It asserted that as few as 4% of customers actually clicked to view the terms and conditions.[5] And the FTC highlighted four customer complaints from 2022 about deceptive fee billing.

At the hearing, the court announced that it wasn't "100 percent convinced . . . that a perfect form of indicating informed consent is the ultimate talisman of success[.]"

In an effort to resolve the case, the court recommended mediation. But the parties weren't able to negotiate a resolution.

So on June 8, 2023, the district court issued a 22-page order granting the FTC a permanent injunction. As the court recognized, "[t]he Complaint charges that Defendants have engaged in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act . . . in the promoting, offering for sale, and servicing of [Corpay's] fuel card products[, and t]he Complaint seeks permanent injunctive relief . . . for the Defendants' deceptive and unfair acts or practices as alleged therein." Then the court found that "a

[5] Corpay maintains it does not keep complete data on the number of clicks on the Terms and Conditions, and the data the FTC cites is incomplete, representing only the minimum number of customers who clicked the link. Noting the data goes back to January 2017, Corpay also asserts the figure does not come from the "Express Informed Consent Project" but "from a completely different portion of the website."

permanent injunction containing the provisions" in the order was "proper."

That injunction prohibits deceptive advertising and failure to credit timely payments, requires increased disclosure in advertisements, and contains compliance mechanisms. But most relevantly for this case, the court also permanently restrained Corpay from charging for items without first obtaining a customer's express informed consent after Corpay "conspicuously disclose[d]" all related information:

> Defendants are permanently restrained and enjoined from selling or charging for Add-On Products or Services without first securing a customer's Express Informed Consent to charge for each particular Add-On Product or Service charged. In obtaining Express Informed Consent, Defendants must Clearly and Conspicuously disclose all required information for each Add-On Product or Service.
>
> Defendants . . . in connection with Payment Products, are permanently restrained and enjoined from billing a consumer for any charge unless Defendants have obtained the consumer's Express Informed Consent to that charge.

> Defendants . . . are permanently restrained and enjoined from billing existing consumers for any Add-On Products or Services and fees for which Defendants have not previously secured the consumer's Express Informed Consent.

The order defines "Express Informed Consent" to require several components. And to avoid confusion, the order specifies examples that don't qualify as "Express Informed Consent." In particular, the order requires "Express Informed Consent" to consist of an affirmative act that, based on the circumstances, clearly shows the customer agreed to the charge:

> [A]n affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure of the following information related to the charge(s): (a) the product, service, fee, or interest associated with the charge; (b) the specific amount of the charge; (c) whether the charge is recurring and the frequency of recurrence; and (d) under what circumstances the charge will be incurred. The following are examples of what does not constitute Express Informed Consent to be charged:

1. Assent obtained solely through the use or continued use of Corporate Defendant's Payment Products;
2. Assent that Corporate Defendant reserves the right to change the amount or terms of the charge, without separately having obtained from the consumer an affirmative action communicating assent for the particular change in the amount or terms of the charge;
3. *Assent to more than one charge through a single expression of assent*;
4. Assent obtained only after a consumer has been charged, including through disclosure on the consumer's billing statement, without a separate affirmative act of assent by the consumer; and
5. Assent obtained solely through any practice or user interface that has the

> substantial effect of subverting or impairing consumer autonomous decision-making or choice, including but not limited to using text that is not easily legible. *Material terms may not be disclosed behind a hyperlink or tooltip but can be disclosed in a dropdown icon or pop-up that requires consumers to provide assent immediately after the disclosure of the material terms* . . . .

The order defines "Clear and Conspicuous" as "a required disclosure [that] is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways: . . . 4. In any communication using an interactive electronic medium, such as the Internet or software, *the disclosure must be unavoidable*."

Corpay now appeals the district court's order granting summary judgment against it and Clarke. It also seeks vacatur of the Express Informed Consent provisions of the permanent injunction, independent of the liability decision.

## II. DISCUSSION

Corpay raises three principal challenges to the district court's judgment: that the court (1) improperly granted summary

judgment on all five counts of the of the FTC's complaint; (2) erred in granting summary judgment as to Clarke's personal liability; and (3) exceeded its equitable authority in fashioning the "Express Informed Consent" portions of the permanent injunction.

For the most part, we disagree. The FTC presented undisputed evidence that entitles it to judgment as a matter of law on all five counts against Corpay. And it has similarly met its burden on four counts against Clarke. But we agree that the FTC has not met its burden to show the absence of a genuine dispute of material fact as to Clarke's liability on Count II. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As for the "Express Informed Consent" provisions of the permanent injunction, we conclude that the district court didn't abuse its discretion. Rather, the court acted within its traditional equitable authority. So we affirm the grant of a permanent injunction against Corpay. But we vacate the injunction against Clarke and remand to the district court to account for the lack of summary judgment on Count II.

Our discussion proceeds in four parts. First, we review the district court's grant of summary judgment on the three deceptive advertising counts (Counts I–III). Second, we consider the billing-practice counts (Counts IV and V). Third, we address Clarke's personal liability. Finally, we evaluate the scope of the permanent injunction.

### A. *The district court correctly granted summary judgment to the FTC on Counts I through III alleging deceptive advertising.*

We begin with the district court's decision granting summary judgment on Counts I through III, the deceptive-advertising counts. We review de novo a grant of summary judgment. *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1333 (11th Cir. 2023). Summary judgment is appropriate when "no genuine dispute as to any material fact" exists "and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

We have a genuine dispute of material fact only if a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing the absence of a genuine dispute. *Celotex Corp.*, 477 U.S. at 323. Once the moving party does so, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986)). And when the record "blatantly contradict[s]" one side's version of events so much so that "no reasonable jury could believe it," a court need not adopt that version in deciding summary judgment. *Id.*

Corpay does not challenge the overarching legal standard under which the district court evaluated its advertisements. Instead, it argues that the district court improperly resolved genuine disputes of material fact relating to all three counts.

To frame our discussion, we start with the governing standard under § 5(a) of the FTC Act, 15 U.S.C. § 45(a). To establish deceptive advertising, the FTC must show that (1) the defendant made a representation; (2) the representation was likely to mislead reasonable customers acting under the circumstances; and (3) the representation was material. *FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021). A practice may qualify as deceptive without proof of intent. *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1368 (11th Cir. 1988).

We review de novo the district court's decision to grant summary judgment. So in conducting our review, we assess the evidence in the light most favorable to Corpay as the non-moving party. *Scott*, 550 U.S. at 380.

Generally, whether an advertisement is likely to mislead reasonable consumers presents a question of fact. *See On Point*, 17 F.4th at 1079–80. But we may resolve that question on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (quotation marks omitted). Here, the undisputed evidence establishes that each set of advertisements made material, false representations. As a result, the district court properly entered summary judgment for the FTC on all three counts. We address each in turn.

1. <u>Count 1: "Per Gallon Discount" Advertisements</u>

First, we consider the "per gallon" advertisements. The district court concluded that no reasonable factfinder could disagree

that "the net impression of the representations in the ads . . . promise that consumers would be afforded certain per-gallon savings throughout the Fuelman Network and wherever MasterCard is accepted, without condition or caveat." Corpay doesn't challenge the materiality of these representations. It also doesn't dispute that customers failed to receive the advertised discounts. And after reviewing the content of these advertisements, we agree with Corpay's determinations in these regards. As we've described, these ads generally contained a central, large-font claim to per-gallon discounts with small-print disclosures and caveats that effectively negated much, if not all, of the advertised savings.

Corpay instead contends that certain caveats and disclaimers created factual disputes about whether the ads were deceitful. In support, Corpay makes six assertions: (1) some of the advertisements contained language that savings would be "up to" the specified amount; (2) Corpay presented evidence that its customers were "sophisticated," so they would have understood the savings to have caveats; (3) Corpay disputed evidence that customers complained about discounts; (4) some but not all the ads' disclosures reserved the right to alter the discounts; (5) Corpay did not have to reserve the right to alter its discounts because that's an industry standard term; and (6) most of the advertisements contained text with asterisks that led to the small-print disclosures.

We are not persuaded.

First, that a minority of advertisements promised savings "up to" a certain amount does not create a dispute of material fact.

As our sister circuits have recognized, "each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive advertisements." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014) (citation and quotation marks omitted); *see also Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989). And most of Corpay's ads in this category omitted the "up to" qualifier. So even when we consider the few that included the "up to" language, it doesn't absolve Corpay of its violations.

Second, Corpay's evidence that altering rebates *with* disclosure is an "industry-standard" practice doesn't create a triable issue. The relevant question is whether Corpay changed rebates *without* disclosure. And the record shows it did.

Third, Corpay's reliance on the supposed sophistication of its customer base also fails. The only evidence Corpay cites to support its argument is that it does business with large, multinational corporations like Coca-Cola and FedEx. But even Corpay concedes that, at most, these brands make up just 10% of its business. And it doesn't dispute that the vast majority of its customers lack similar sophistication.

Fourth, whether customers complained does not raise a material fact. Actual deception is not an element of an FTC deceptive-advertising claim; the question is whether an ad is likely to mislead. *See On Point*, 17 F.4th at 1079. A false advertisement can be likely to deceive even if no consumer complains. And in any case, the district court excluded the expert report Corpay relies on to dispute

that customers complained. But even if it hadn't, that report did not examine the advertisements at issue.

Finally, Corpay's disclaimers don't save its advertisements. Disclaimers or qualifying language may in some circumstances dispel an otherwise misleading impression. But as the Ninth Circuit has explained, that's not the case when a disclaimer is small, ambiguous, or contradicted by the body of the ad. *See FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200–01 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

The First Circuit has reached the same conclusion. *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010). It has said that disclaimers "are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *Id.* (quotation marks omitted).

Corpay's ads fall into the category of ads with insufficient disclosures. The disclosures were too small to suggest that consumers actually read them. After all, Corpay's own employees had special, larger versions of the disclosures so they could read them.

And even if the consumers were able to and did read the disclaimers, the disclaimers contained vague, confusing, and arguably contradictory terms. Many disclaimers didn't warn that Corpay could discontinue discounts without notice after a few months or with insufficient purchases. And they directed consumers to vague

terms and conditions or customer service. Most tellingly, many disclaimers excluded discounts from major retailers that the body of the ads featured prominently as providing discounts. Plus, nothing in the disclaimers gave customers notice that the company "had [issued] minimal/no [small-to-medium sized business] rebates since the beginning of 2015." In short, the undisputed evidence shows that Corpay's "per-gallon discount" advertisements were deceptive as a matter of law.[6]

2. Count II: "Fuel Only" Advertisements

We turn next to Count II and the "Fuel Only" ads. The district court didn't err in granting summary judgment to the FTC on this count.

Corpay's ads represented that it could restrict its cards to "Fuel Only" purchases. Corpay doesn't dispute this. Nor does it challenge the district court's conclusion that this representation was material. Instead, Corpay argues that a genuine dispute exists

[6] Under the less demanding clearly erroneous standard of review (as opposed to the more demanding de novo standard under which we review a grant of summary judgment like the one here), we have determined that a district court did not err when it found that "disclosures written in relatively smaller and pale-colored font" did not cure website "language in larger, more colorful font." *On Point*, 17 F.4th at 1079–80; *see also FTC v. Brown & Williamson Tobacco Co.*, 778 F.2d 35, 45 (D.C. Cir. 1985) (similarly upholding under clearly erroneous review a finding that a disclosure that was "virtually illegible form, placed in an inconspicuous corner of [the] advertisements" did not alter an advertisements representation). Those decisions underscore the same principle that governs here: tiny or otherwise-obscure disclosures can't overcome a deceptive net impression.

as to whether the ads' claim was false and therefore likely to deceive. In support, Corpay relies on testimony from one of its executives asserting that "Fuel Only" cards were limited to authorizing fuel only purchases "at-the-pump."

But the record "blatantly contradict[s]" that testimony, *Scott*, 550 U.S. at 380. Internal documents described "Fuel Only" as a "misnomer," acknowledged that "Fuel Only" cards could be used to purchase snacks, beer, and other non-fuel items, and explained that "at-the-pump" restrictions were merely optional and applied only when a customer affirmatively selected them. Even Corpay's own expert found 10% of in-store purchases and 3% of all transactions with "Fuel Only" cards were not for fuel. And customers complained of non-fuel purchases on their "Fuel Only" cards—in one case, $208,688.05 in purchases of Safeway gift cards.[7]

On this record, no reasonable jury could find Corpay in fact limited "Fuel Only" cards to fuel purchases. So the district court did not err in granting summary judgment.

3. <u>Count III: "No Transaction Fees" Advertisements</u>

---

[7] Corpay cursorily disputes citation to these customer complaints as inadmissible hearsay. But Corpay raises its argument only "in a passing reference . . . in a footnote." *See LaCroix v. Town of Fort Myers Beach, Fla.*, 38 F.4th 941, 947 n.1 (11th Cir. 2022). So Corpay forfeits this argument. And in any case, even if the district court should have excluded these complaints—to be clear, we don't opine on this issue—the record still contradicts Corpay's narrative without them.

We consider next Count III of the complaint, which alleges Corpay falsely represented that some of its cards carried "no transaction fees." Corpay does not dispute that its advertisements materially represented that its cards had "no transaction fees." Nor does it dispute that it charged three of its fees (the Convenience Network Surcharge, Minimum Program Administration Fee, and High Risk Pricing)[8] on a "per transaction" or "per gallon" basis under some conditions. Instead, Corpay argues that a reasonable jury could find that customers would understand the term "transaction fee" as "a fee charged by a company per every transaction (for the right to make the transaction)." And it contends that its Convenience Network Surcharge, Minimum Program Administration Fee, and High Risk Pricing were not actually "transaction fees," even though Corpay itself referred to them that way and charged them on a transactional basis to many of its customers.

We think that's nonsensical. Internally, Corpay referred to both the Convenience Network Surcharge and High Risk Pricing as "transaction fees." Corpay charged both fees "per transaction." And though Corpay charged the Minimum Program Administration Fee "per gallon," that still qualifies as a "transaction fee" because the relevant transactions are fuel purchases, which are

---

[8] Corpay disputes that "High Risk Pricing" was a "fee." Instead, Corpay asserts that it's "a form of risk based pricing" for higher-risk customers. But this distinction is purely semantics. High Risk Pricing was an additional charge *on every transaction* for a certain class of customers. In other words, it was a fee. Indeed, internal documents indicate that Corpay uniformly applied it to each transaction for those customers.

assessed "per gallon." So Corpay also charged that fee "per transaction."

We can slice the baloney only so thin. A fee called a "transaction fee" that is charged per transaction is a transaction fee. Indeed, Corpay's Terms and Conditions allowed the High Risk Pricing fee for any customer who "*operates in the trucking or transportation industry.*" So a huge chunk of Corpay's customer base—businesses that purchase fuel cards for vehicle fleets—qualified as "High Risk" and was subject to a blanket fee per transaction.

The only record evidence Corpay cites to support its definition is the testimony of its executives that the relevant fees were not considered "transaction fees." This testimony does not create a genuine dispute because the record "blatantly contradict[s]" it, *Scott*, 550 U.S. at 380.

Corpay's efforts to liken the three transaction fees to "Overdraft Fees," which it asserts are not "transaction fees," fares no better. Overdraft fees are different in kind; they apply when the customer spends beyond the funds available in an account. The fees here, by contrast, kick in under regular use of the card.

No reasonable fact finder could conclude that Corpay did not charge "transaction fees." For that reason, we hold that the district court properly granted summary judgment to the FTC on Count III, just as it did on Counts I and II.

***B. The FTC is entitled to summary judgment on Counts IV and V of its complaint alleging deceptive and unfair billing practices.***

We move next to Corpay's challenge to the grant of summary judgment on Counts IV and V of the FTC's complaint. As we've mentioned, if the FTC is entitled to summary judgment on Count V, alleging unfair billing practices, it is also entitled to summary judgment on Count IV. Corpay doesn't disagree. So we need address only Count V, alleging unfair practices in violation of the FTC Act.

Under Section 13(b) of the FTC Act, "[w]henever . . . any person, partnership, or corporation is violating, or is about to violate" Section 5 of the Act, the FTC may bring an action in federal district court. (15 U.S.C. § 53(b); *id.* § 45(a)). Section 5(a) of the FTC Act, 15 U.S.C. § 45(n), in turn, defines a practice as "unfair" if it "[1] causes or is likely to cause substantial injury to consumers which is [2] not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." In assessing whether an act is "unfair," the FTC "may consider established public policies as evidence to be considered with all other evidence." *Id.* But "[s]uch public policy considerations may not serve as a primary basis for" determining an act as "unfair." *Id.*

Corpay argues that the district court erred in applying these standards, so it improperly granted summary judgment on Count V (and by extension Count IV) as to both the seven unauthorized fees and the late fees. We disagree. When we construe all genuine disputes of material fact in favor of Corpay, all its fee-billing practices qualify as "unfair" under the FTC Act.

We first address Corpay's challenge to the grant of summary for the seven unauthorized fees. Then, we turn to the late fees.

1. The Unauthorized, Unexpected Fees

Corpay argues that the district court erred in granting summary judgment on Count V as to the seven unauthorized fees. In support, it invokes three reasons: the court allegedly (1) applied the wrong legal standard, (2) overlooked genuine disputes of material fact, and (3) took no account of the Express Informed Consent Project. We find no merit to any of these arguments.

*i. Corpay advances the wrong legal standard.*

First, we address the proper legal standard. Quoting our decision in *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1231 (11th Cir. 2018), Corpay argues that the FTC "must find the standards of unfairness it enforces in 'clear and well-established' policies that are expressed in the Constitution, statutes, or the common law." The district court did not apply that limitation, and Corpay argues it found the company's "past practices unfair under Section 5 [only] because the fees were 'unexpected.'" Putting aside this oversimplification of the district court's reasoning, Corpay's argument is not persuasive for four reasons.

First, assuming without deciding that the district court erred by not applying the standard Corpay says *LabMD* requires, Corpay invited any error. We have explained that "invited error" occurs "when a party induces or invites the district court into making an error." *United States v. Maradiaga*, 987 F.3d 1315, 1322 (11th Cir. 2021) (citation and quotation marks omitted). Here, in their brief

opposing the FTC's summary-judgment motion, Corpay and Clarke argued as to the governing standard, "To prove unfairness, the FTC must show that the practice 'results in substantial consumer injury that is not reasonably avoidable and is not outweighed by any countervailing benefits to consumers.'" That's it. Nothing else. And the standard Corpay invoked in its opposition brief was precisely the one the district court applied. So Corpay invited any error the district court may have committed by not applying what Corpay now says is the standard. "Where a party invites error, the Court is precluded from reviewing that error on appeal." *Id.* (citation and quotation marks omitted).

Second, even if Corpay could get by its invited error—it can't—Corpay is wrong that the quoted language from *LabMD* controls the standard. To be sure, in *LabMd*, we said that practices the FTC targets must be "unfair under a well-established legal standard, whether grounded in statute, the common law, or the Constitution." *See* 894 F.3d at 1229 n.24. But that was dictum, and as we explain in our third point, it was also incorrect.

In *LabMD*, the FTC ordered LabMD "to install a data-security program that comported with the FTC's standard of reasonableness." *Id.* at 1227. LabMD challenged that order on the basis that the order did not direct it to "cease committing an unfair 'act or practice' within the meaning of Section 5(a)." *Id.* But rather than considering whether the FTC's position that "LabMD's negligent failure to design and maintain a reasonable data-security program invaded consumers' right of privacy and thus constituted an

unfair act or practice," we "assume[d] *arguendo*" that it did. *Id.* at 1231. Then we said the order was unenforceable, anyway, because the FTC's order's prohibitions weren't specific enough. *See id.* at 1237. Because we didn't have to decide—and we never in fact determined—whether LabMD's practices were "unfair" to resolve LabMD's petition, the quoted statement from *LabMD* was dictum. *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us.") (citation and quotation marks omitted). "And dicta is not binding on anyone for any purpose." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010).

But third, Corpay (and *LabMD*) gets the proper standard for evaluating "unfair" practices wrong. In construing a statute, we always start (and often end) with the text. *Heyman v. Cooper*, 31 F.4th 1315, 1318 (11th Cir. 2022). Under section 45(n), a practice cannot be "unfair *unless* the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n) (emphasis added). As "unless" conveys, the three factors that follow it are mandatory for a finding that a practice is "unfair." *See*, MERRIAM-WEBSTER, "UNLESS," (last visited Oct. 13, 2025), https://perma.cc/LMR9-2FST (defining "unless" to be a conjunction signaling "except on the condition that . . . .").

By contrast, Section 45(n) continues, stating that "[i]n determining whether an act or practice is unfair, the Commission *may* consider established public policies as evidence *to be considered with all other evidence*. . . ." 15 U.S.C. § 45(n) (emphasis added). As the permissive "may" indicates, the FTC has *discretion* to consider "public policies" when deciding a practice is "unfair." *United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."). But if it does so, the FTC must balance those "public policies" with other evidence that might contraindicate them. *See* 15 U.S.C. § 45(n). The statute goes so far as to mandate that "[s]uch public policy considerations . . . not serve as a primary basis for" determining an act "unfair." *Id.* Put simply, the statutory text unambiguously does not require the FTC to make a showing that well-established public policies deem an act "unfair."

But fourth, even if we were to adopt *LabMD*'s "well-established policies" dicta—as should be clear by now, we don't—the FTC would still be entitled to summary judgment as to the "unexpected" fees. The FTC offers several "well-established" common-law policies that establish Corpay's conduct as unfair. For starters, we have held "[*c*]*aveat emptor* ["buyer beware"] is not the law in this circuit." *FTC v. IAB Mktg. Assocs. LP*, 746 F.3d 1228, 1233 (11th Cir. 2014). And the FTC has offered a "mountain of evidence," as the district court described it, that the company didn't clearly inform customers of these fees before and after the sales process and didn't clearly disclose that these fees were optional upon automatic enrollment. So Corpay misrepresented its product to customers, and

under the law of this circuit, customers are not on the hook for these misrepresentations.

The FTC also points out that the common law in many states prohibits "procedurally unconscionable" contracts. In Georgia, for example, "some factors courts have considered in determining whether a contract is procedurally unconscionable include[] the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *NEC Tech., Inc. v. Nelson*, 478 S.E.2d 769, 771–72 (Ga. 1996).

The FTC presented evidence that Corpay has not genuinely disputed that the company purposely obfuscated its oppressive terms. For instance, Corpay made its Terms and Conditions dense, confusing, and difficult to access for several years; did not clearly disclose the optional nature of certain fees; and made it difficult to discover which fees it charged with vague language on "Fleet Management Reports." Plus, Corpay had uneven bargaining power with its relatively unsophisticated customer base, and Corpay used that power to set up a system to charge them fees without their knowledge.

Plus, even under the governing contract-law principle Corpay identifies, "inquiry notice," Corpay's fee practices fail. Under "inquiry notice," if a party lacks "actual notice" of a contract's terms, whether the terms bind them "often turns on whether the contract terms were presented to the offeree in a clear and

conspicuous way." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). A contract must be a "manifestation of mutual assent." *Id*. But Corpay doesn't offer evidence to genuinely dispute that before its Express Informed Consent project, it didn't offer its fee terms in a "clear and conspicuous way."

Indeed, it's undisputed that before this project, three fees were not even in the Terms and Conditions. And the company made the Terms and Conditions difficult to read, which required it provide a reader-friendly version for its own employees. Any testimony to the contrary from Corpay's executives is "blatantly contradicted by the record," *Scott*, 550 U.S. at 380, so it doesn't create a genuine dispute of material fact.

Even after Corpay's Express Informed Consent Project, Corpay didn't give its customers inquiry notice for many fees. In this respect, the new Terms and Conditions weren't clear as to some of the fees. For example, though they described Accelerator Rewards, Clean Advantage, and Fraud Protector as "program fees," they didn't clearly disclose them as optional. And by October 2020, according to Corpay's own expert, ten months after the FTC's complaint, 18.8% of customers still had not expressly consented to the new Terms and Conditions.

In sum, Corpay's *LabMD* argument fails because (1) Corpay invited any error, (2) the *LabMD* standard is dictum, (3) the *LabMD* standard violates the plain text of the governing statute, and (4) even if the *LabMD* standard applied, the FTC satisfied it.

*ii. Corpay doesn't present a genuine dispute over whether it unfairly hid fees.*

Corpay also argues that even under the standard the district court applied, the district court erred in granting the FTC summary judgment. In Corpay's view, the district court resolved genuine disputes of material fact to decide that customers were (1) substantially injured in a manner that (2) wasn't reasonably avoidable. We disagree.

We begin by recognizing Corpay doesn't dispute that it charged customers the relevant fees. Instead, Corpay asserts that a genuine dispute exists over whether it disclosed the fees or the fees were instead "unexpected."

Corpay's case lacks the gas to scale the FTC's "mountain of evidence." Internal documents revealed that for several of the fees, Corpay automatically enrolled customers without their knowledge. And internal emails and customer complaints reflected that Corpay didn't tell customers of these fees during the sales process. Plus, the Terms and Conditions were dense, vague, and largely inaccessible, available only by mail for at least three years. Corpay also hid the fees on invoices and failed to detail them on billing reports. When the FTC conducted a telephonic survey, it learned that only 7.02% of customers were informed of fees. And in eight internal surveys from 2016–2020, Corpay itself identified its fee practices confused and surprised its customers.

To top it off, internal documents showed that Corpay intentionally didn't inform customers and made it difficult for them to learn about fees.

In response, Corpay fails to offer evidence that creates a genuine dispute of material fact over whether it charged undisclosed fees. Corpay mainly cites its executives' testimony that Corpay disclosed its fees with its Terms and Conditions and trained its sales representatives to discuss fees. But either the record "blatantly contradict[s]" that testimony, *Scott*, 550 U.S. at 380, or that testimony doesn't conflict with the FTC's evidence.

Corpay next points to its experts' assertions that the FTC's telephonic survey lacks methodological reliability. But even if we disregard the survey, the record unambiguously shows that Corpay notified only very few of its customers of changes. Other evidence, as we've discussed, also overwhelmingly supports the FTC's claims that Corpay didn't disclose its fees or obtain its customers' consent before imposing its fees.

Corpay tries to get out from under the evidence by relying on expert testimony that customers' fuel-purchase rates didn't change after Corpay assessed them fees. But that doesn't dispute that the company didn't disclose the fees in the first place. Nor does Corpay fare any better with its argument that it used a mailer to notify customers of the three fees that were not in the Terms and Conditions. As the district court noted, those mailers didn't unambiguously explain that the fees were optional. They also didn't seek further authorization from the customers.

To conclude, Corpay failed to identify evidence that creates a genuine dispute that it charged undisclosed fees.

*iii. Evidence of the "Express Informed Consent Project" does not preclude summary judgment for the FTC.*

Corpay also asserts the district court erred by not considering its "Express Informed Consent Project" when it granted summary judgment. But this evidence does not warrant vacating the judgment. As we've explained, by October 2020, ten months after the FTC's complaint, 18.8% of customers still had not expressly consented to the new Terms and Conditions. And Corpay hasn't established that it even sent these new Terms and Conditions to the customers it had before the FTC filed its complaint. So on this record, the district court did not err in concluding that no genuine dispute existed over whether Corpay was charging existing customers fees without their express, informed consent; Corpay was.

As a result, the district court did not err in granting summary judgment to the FTC on Counts IV and V of its complaint as those claims relate to Corpay's add-on fee-billing practices.

2. <u>Erroneous Late Fees</u>

The district court also properly granted summary judgment to the FTC for Corpay's late-fee practices. Corpay does not contest that before 2018 it unfairly assessed late fees. Instead, Corpay urges, the FTC Act requires the Commission to show that, at the time the FTC filed its complaint, Corpay "[was] violating, or [was] about to violate" the FTC Act. 15 U.S.C. § 53(b). This burden, the company asserts, demands a showing that Corpay's "existing or

impending conduct" was unlawful at time of complaint. *See FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019). Because the district court relied primarily on evidence from 2017 and 2018, and Corpay changed its online payment system in 2018, Corpay contends the FTC's evidence was too "stale" to support summary judgment on a complaint it filed in 2019.

Our sister circuits have split on whether the FTC must show that the company's "existing or impending" practices violate the FTC Act at the time of the complaint. *Compare Shire ViroPharma,* 917 F.3d at 156 (requiring the FTC to plead "existing or impending conduct") *with FTC v. Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) (allowing an action where the conduct was only "likely to recur"); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1191 (10th Cir. 2009) (same). But we need not weigh in on this split. Even assuming the FTC had to show that Corpay's "existing or impending" practices violated the FTC Act when the FTC filed its complaint, no genuine dispute exists over whether the FTC has met that burden.

To start, Corpay updated only its *online* payment system in 2018. But the district court granted summary judgment because of late fees Corpay assessed on mail and phone payments as well. And Corpay doesn't argue that those forms of payment changed in 2018. So right off the bat, summary judgment remains appropriate at least with respect to late fees Corpay assessed on those payments.

And as for the online payments, much of the genuinely undisputed evidence from 2017 and 2018 remains probative for the

claim that Corpay was still engaging in unfair practices in 2019. Several internal surveys and customer complaints revealed widespread problems with improper late fees. Not only that, but the FTC's telephonic survey, which it conducted in 2020—two years after Corpay adopted its new online-payment system—found 37.90% of Corpay customers had been improperly assessed late fees. Faced with this evidence, Corpay presents no evidence that customer complaints for late fees stopped in 2019.

Finally, Corpay admits to continuing certain late-fee practices in 2019 from 2017 and 2018, when even it does not dispute it violated the FTC Act. It still marks payments it receives after 4 p.m. ET as late. Corpay also doesn't contest that it still makes payments due on weekends and marks them late if it receives them after 4 p.m. on Fridays. The district court relied on these facts when it entered summary judgment against Corpay, and these facts didn't change from 2018 to 2019.

So though Corpay changed its online-payment system in 2018, it has not created a genuine dispute that when the FTC filed its complaint, Corpay continued to wrongly charge customers late fees.

### C. *The FTC is entitled to summary judgment as to the personal liability of Clarke on all but Count II.*

Now that we've determined that the FTC is entitled to summary judgment on all five counts against Corpay, we move to the FTC's claims against Ronald Clarke personally.

The parties don't contest the proper legal standard for when an individual is liable for a corporation's violation of the FTC Act. Under our precedents, "the FTC must show that the individual had 'some knowledge of the practices' and that the individual either 'participated directly in the practice or acts or had the authority to control them.'" *On Point*, 17 F.4th at 1083. Corpay concedes Clarke had "authority to control" its conduct. So we assess whether the FTC proved without genuine dispute that Clarke had "some knowledge" of Corpay's illegal conduct.

Our precedents have yet to define the meaning of "some knowledge." But as our sister circuits have recognized, "showing that the individual had actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth," satisfies that standard. *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014); *accord FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005).

As the FTC points out, this is not a "high bar." For example, we have found the CEO of a scam operation had "some knowledge" even though he claimed he was "only involved in high-level decision making and had no knowledge of or control over the contents of [the] websites." *On Point*, 17 F.4th at 1083. There, a set of slides the CEO created describing the company's services and business model and his general awareness of the company's finances and operations satisfied the requirement. *Id.* at 1083-84. In another case, we found an executive had some knowledge of its

company's misrepresentations because he had received a report from a compliance officer that included that information. *See FTC v. IAB Mktg. Associates, LP*, 746 F.3d 1228, 1233 (11th Cir. 2014).

The FTC easily clears the "some knowledge" hurdle. The evidence of Clarke's knowledge of the conduct underlying four of the five counts is overwhelming and indisputable.

We begin with Count I, the "per-gallon" discount ads. As the district court pointed out, Clarke's subordinates informed him that "customers often paid more than the pump price of fuel despite per-gallon savings promised." And they let him know that "[s]mall and medium-sized business customers received 'minimal/no' rebates for at least two years." Clarke also received a PowerPoint describing customer complaints about discounts. But despite this information, in a 2017 call with company shareholders, he boasted about the company's discounts and rebates.

As for the "no transaction" fee ads that underlie Count III, Clarke approved the Minimum Program Administration Fee. And at the shareholder meeting, he discussed the revenue from both the Minimum Program Administration Fee and "high-risk credit fees."[9] True, the FTC and the district court don't acknowledge that he discussed specifically the "no transaction fee" ads. But the record is clear that Clarke knew of the underlying fees the Corpay ads advertised. Plus, Clarke knew customers had complained that

---

[9] Clarke even referred to "High Risk Pricing" as "high-risk credit *fees*," despite the company's insistence that "High Risk Pricing" is not a "fee."

Corpay wrongfully assessed them these fees. That information gave him "some knowledge" that Corpay was misrepresenting the existence of these fees.

The evidence is most damning against Clarke on Counts IV and V of the complaint, relating to the company's unfair-billing practices. As the district court highlighted, subordinates informed Clarke that Corpay's "practices with regard to disclosing fees in its [Terms and Conditions] are vague, while its methods of disclosing fees on invoices and notifying customers of new or increased fees are nearly nonexistent." And Corpay's shareholders and corporate partners contacted Clarke to inform him of customer complaints about the company's fee practices. Not only that, but Clarke received and read public reports detailing Corpay's unfair-fee practices. Faced with this information, Clarke chose to dismiss it all as "fake news." That betrays at minimum a reckless indifference to the truth.

Clarke also specifically addressed reports of unfair late fees at the 2017 shareholding meeting. But he responded by asking his subordinates for "opportunities to get more late fee revenue . . . ." So Clarke had "some knowledge" of Corpay's "unauthorized" fees and its erroneous late fees.

Given the low bar for establishing "some knowledge," and all this evidence, no reasonable jury could find for Clarke on Counts I, III, IV, and V of the FTC's complaint.

Still, Corpay seeks to absolve Clarke's knowledge by arguing he sought information in "good faith" to bring the company into

compliance. But even assuming that's so, Clarke, with control of Corpay's operation, did not cease its unlawful practices. We have never recognized a "good faith" exception when the "some knowledge" requirement is met. A truly good-faith actor with "actual control" and "some knowledge" would end the company's unlawful practices. And in any case, the record doesn't support that Clarke was acting in "good faith." As we've noted, he dismissed concerns with Corpay's practices as "fake news" and asked his subordinates to find ways to extract more late fees.

But the FTC has not met its burden on one count of its complaint against Clarke: Count II, concerning the "Fuel Only" ads. None of the evidence of Clarke's communications that the FTC cites speak specifically to the "Fuel Only" ads. And at oral argument, the FTC could not identify any evidence in the record showing Clarke had "some knowledge" of the "Fuel Only" ads. So we conclude the district court erred by granting the FTC summary judgment on this count. We therefore vacate the grant of summary judgment to the FTC on Count II as to Clarke's liability.

Thus, the FTC is entitled to summary judgment as to the personal liability of Clarke on Counts I, III, IV, and V of its complaint, but not on Count II.

### D. *The district court did not abuse its discretion fashioning the Express Informed Consent provisions of the permanent injunction.*

But the grant of summary judgment against Corpay on all five counts remains. So we turn to the company's challenge to the proper scope of the permanent injunction against it.

We review for abuse of discretion both the decision to grant a permanent injunction and the scope of an injunction.[10] *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008). "An abuse of discretion occurs when a district court commits a clear error of judgment, fails to follow the proper legal standard or process for making a determination, or relies on clearly erroneous findings of fact." *FTC v. Nat'l Urological Grp., Inc.*, 80 F.4th 1236, 1241 (11th Cir. 2023) (quoting *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017)).

Corpay argues that the district court abused its discretion in fashioning the injunction's Express Informed Consent provisions. In this respect, Corpay contends the district court exceeded its remedial authority by "[o]rdering that [Corpay's] fee disclosures be

---

10 Corpay asserts that "[t]he scope of the district court's remedial authority under [15 U.S.C. § 53(b)] is a 'purely legal question' reviewed de novo." But the case it cites for this proposition doesn't support that proposition. Rather, it states only that whether the proper interpretation of the statutory term "permanent injunction" includes the authority to order "monetary relief" is a "purely legal question." *See AMG Capital Mgmt.*, 593 U.S. at 74. As we explain above, under our precedents, we review the scope of a "permanent injunction" for abuse of discretion.

'unavoidable'"; "[f]orbidding [Corpay] from continuing to make disclosures via hyperlinks"; and "[f]orbidding [Corpay] from obtaining assent to more than one charge through a single expression of consent." Based on these claims, Corpay asks us to vacate the Express Informed Consent provisions in their entirety, or at a minimum, to remand with an order to the district court to make the following modifications:

> The sentence "Material terms may not be disclosed behind a hyperlink or tooltip but can be disclosed in a dropdown icon or pop-up that requires consumers to provide assent immediately after the disclosure of the material terms" should be deleted.
>
> The sentence "In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable" should be revised to state "In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must provide a reasonable opportunity for the customer to review the information that is the subject of the disclosure."
>
> In the definition of mechanisms that do not constitute "Express Informed Consent," the following bullet point should be deleted: "Assent to more than one

> charge through a single expression of assent."

Because Corpay asserts that the district court exceeded its authority, we begin by summarizing the scope of the district court's remedial authority under the FTC Act. We then address whether the district court properly granted permanent injunctive relief. And we conclude by considering whether the district court properly tailored its injunction to the wrong it was remedying. We are persuaded it did.

1. The Scope of Remedial Authority Under the FTC Act

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) authorizes the Commission to seek and the district court to issue a permanent injunction "in proper cases . . . and after proper proof." This provision permits the district court to "exercise its inherent equitable power[,]" *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996), but relief must be "prospective, not retrospective." *See AMG Cap. Mgmt.*, 593 U.S. at 76.

A court may certainly enjoin "ongoing" illegal conduct. *See Reich v. Occupational Safety & Health Rev. Comm'n*, 102 F.3d 1200, 1202 (11th Cir. 1997). But if "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future," that may also warrant injunctive relief. *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978)).

In determining whether an injunction is appropriate, the district court must consider six factors: "the egregiousness of the

defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322–23 (11th Cir. 1982) (quoting *Blatt*, 583 F.2d at 1334, n.29). We call these the "*Carriba Air* factors." Though a court should consider each *Carriba Air* factor, it need not make a finding on every one. *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1328 (11th Cir. 2018).

When injunctive relief is appropriate, the "injunction must be narrowly tailored to the proven legal violations and restrain no more conduct than reasonably necessary." *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1280 (11th Cir. 2021); *see also Cumulus Media, Inc. v. Clear Channel Commc'ns*, 304 F.3d 1167, 1178 (11th Cir. 2002) (an "injunction must be 'narrowly tailored to fit specific legal violations, because the district court should not impose unnecessary burdens on lawful activity[.]'") (quoting *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999)). Even so, "a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Id.* at 1179; *see also Planetary Motion v. Techsplosion, Inc.*, 261 F.3d 1188, 1204 (11th Cir. 2001). After all, those "caught violating the [FTC] Act . . . must expect some fencing in." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965).

2. <u>The district court did not err in determining a permanent injunction was appropriate.</u>

Corpay argues that it was not engaged in ongoing illegal conduct, and no likelihood of recurrent illegal conduct could support the Express Informed Consent provisions. We disagree.

To start, Corpay contends that the district court made no finding that any of its "post-overhaul" practices, after 2019, violated the law. But the district court did. It found "there is demonstrable record evidence—contrary to Defendants' emphatic position—that [Corpay's] unfair practices persist."

What's more, the record supports the district court's conclusion, so we can't say the district court clearly erred. The court cited a study from 2020 that showed a majority of customers still felt misled by fees. It also noted Corpay did not provide evidence that "it does not automatically opt customers in to fees for 'programs' they have not requested." And indeed, at the later evidentiary hearing, Corpay revealed that it was still automatically charging its customers from before 2020 the offending fees without additional notice. Plus, at the time of the hearing, Corpay was also still assessing the High Risk Fee for both new and old customers. At a minimum, these fees represent the ongoing effects of Corpay's unlawful conduct.

So next, Corpay observes that the district court said Corpay "has not provided any evidence that it has implemented an affirmative disclosure process." But as Corpay points out, its new Terms and Conditions and "Express Informed Consent Project" were in

the record when the district court made this finding. Based on this fact, Corpay asserts that the district made a clearly erroneous finding and did not consider its "post overhaul" practices when deciding whether an injunction was appropriate.

We disagree that the district court clearly erred. Instead, we understand the district court not to have viewed these "overhauled" Terms and Conditions as an "affirmative disclosure." And that's not a clearly erroneous finding. After all, the new Terms and Conditions don't even unambiguously convey that certain fees are optional.

But beyond that, even if we agreed with Corpay that the district court clearly erred in finding that Corpay's illegal conduct persists (we don't), the court didn't clearly err in finding a likelihood that the illegal conduct would recur. For each of the six *Carriba Air* factors, the court made findings that it supported with the record. All counseled in favor of granting a permanent injunction. We can't say any of these findings or the court's overall conclusion that Corpay was likely to reengage in illegal conduct was clearly erroneous.

Corpay also argues that its large investment in its recent legally compliant "overhaul" supports the conclusion that further court-ordered restrictions are unnecessary. But even if we assumed Corpay is currently fully compliant with the FTC Act, Corpay's reforms come in the face of the FTC's litigation. And we must remember that "reform timed to anticipate or blunt the force of a lawsuit offer[s] insufficient assurance that the practice sought to be

enjoined will not be repeated." *NAACP v. City of Evergreen*, 693 F.2d 1367, 1370 (11th Cir. 1982) (quoting *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354–55 (5th Cir. 1977)). Even Corpay's own internal slide described its reason for its "Express Informed Consent Project" as "[t]he FTC alleges that [Corpay's] terms and conditions are insufficient, and in particular fail to fully disclose certain fees. We disagree with the FTC's allegations, but took the opportunity to improve our terms and conditions." The company's behavior offers few assurances it won't revert to unfair practices when the case ends.

3. <u>The Express Informed Consent provisions were "necessary" to prevent Corpay's unlawful conduct.</u>

Next, Corpay contends that the district court abused its discretion by entering the injunction without finding that Corpay's Express Informed Consent provisions were *necessary* to prevent unlawful conduct. And, Corpay urges, the district court could not make that finding. Corpay is wrong on both counts.

To start, the district court made sufficient findings to support the Express Informed Consent provisions of the injunction. Rule 65(d)(1)(A) of the Federal Rules of Civil Procedure requires that "every order granting an injunction and every restraining order must . . . state the reasons why it issued." The district court complied with that requirement. Its order first explained that the FTC had alleged Corpay "engaged in deceptive and unfair acts or practices," for which it sought "permanent injunctive relief." Then, the order established that it was "proper in this case to issue a

permanent injunction containing the provisions set forth" in the order. Put simply, the district court found it "proper" to hold Corpay to the Express Informed Consent provisions to remedy the company's deceptive and unfair . . . practices."

Rule 65(d)(1)(A) does not require more. We have never held that a district court must go into extensive detail when "stat[ing] the reasons" for its injunction. Nor could we. To be sure, Rule 65(d)(B) and (C) direct that the "terms" of the injunction must be "state[d] . . . *specifically*" and the "acts restrained or required" be "describe[d] in *reasonable detail*" respectively. But Rule 65(d)(1)(A) includes no similar requirement for specificity or detail.

Instead, as some of our sister circuits have recognized, to satisfy Rule 65(d)(1)(A), a court need only state the "reasons" with enough specificity that we can conduct "meaningful appellate review." *See In re Jimmy John's Overtime Litig.*, 877 F.3d 756, 766 (7th Cir. 2017); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Mun. of San Juan*, 773 F.3d 1, 10 (1st Cir. 2014); *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 274 (2d Cir. 2011). So we adopt a "a commonsense construction, not a hypertechnical one," of Rule 65(d)(1)(A). *Watchtower Bible*, 773 F.3d at 10. And under that construction, the district court need only provide enough detail in its reasons to allow us to do our job. *See id.*

After all, the interests of preserving judicial resources counsel against remanding a case for additional findings when "we doubt that such action, in the circumstances present here, would add anything essential to the determination of the merits." *See*

*Withrow v. Larkin*, 421 U.S. 35, 45 (1975). So "[w]hile a more elaborate statement of the court's rationale [may be] helpful . . . , it is enough [if] the court ma[kes] the essence of its reasoning plain before ordering injunctive relief." *See Watchtower Bible*, 773 F.3d at 10.

Here, "[t]he district court's orders, read in conjunction with the hearing transcripts, chronicle the court's laudable effort," ably explain why the court determined the relief it granted was necessary to remedy Corpay's illegal conduct. *Cf. id.* at 9. The district court concluded that the Express Informed Consent provisions were "proper" after it held an extensive hearing, the transcripts of which appear in the record. And as we've already discussed, the court held this hearing after it had first detailed findings supporting its conclusion in its summary-judgment order that the record warranted a permanent injunction. *See* Part I.B.1, *supra*. So we have a well-grounded understanding of the reasons for the district court's decision. This is enough to satisfy Rule 65(d)(1)(A).

We have no trouble understanding why the district court fashioned the Express Informed Consent provisions of the injunction. To recap, Corpay argues that the Express Informed Consent provisions prohibiting fee disclosures from being behind a hyperlink, requiring disclosures to be "unavoidable," and requiring a separate assent for each charged fee aren't "necessary" to stop or prevent Corpay from engaging again in illegal conduct. But based on

USCA11 Case: 23-12539 Document: 70-1 Date Filed: 01/06/2026 Page: 74 of 76



this record, we can't say the district court made a clear error in judgment in crafting these requirements for two main reasons.[11]

First, the district court could conclude that express consent, beyond the typical legal minimum, is necessary to remedy the remnants of unfair billing practices that persist even after Corpay's "overhaul." Pre-2020 customers, who continue to make up 65 to 70% of Corpay's clients, are still automatically enrolled in fees they did not originally consent to. And the current Terms and Conditions don't unambiguously disclose these fees are optional. Plus, while 96% of these customers clicked to "agree" to the Terms and Conditions, the evidence shows that as few as 4% actually clicked to read them. So the district court's decision to require Corpay to disclose its fees more prominently was not clear error, given the need to cure the original lack of consent by longstanding customers. All three of the provisions Corpay challenges make it easier for customers to provide their informed consent and to know what Corpay is charging them for.

Second, the district court could reasonably conclude given Corpay's rampant history of illegal acts, that the company needed constraints beyond the legal minimum to ensure future compliance. The district court found that "unfair fee practices were ingrained in the fabric of the company for years." It also found that

[11] We may affirm the grant of an injunction on any ground supported by the record. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1268 n.2 (11th Cir. 2020).

"the conduct was intentional—and that it came straight from the top."

Against this backdrop, the court did not clearly err when it determined it needed to "fence in" Corpay. *Colgate-Palmolive Co.*, 380 U.S. at 395. Requiring Corpay not to hide disclosures behind a hyperlink prevents Corpay from making that link harder to find. After all, Corpay didn't even have online Terms and Conditions until 2017. Similarly, requiring disclosures to be "unavoidable" prevents Corpay from sticking its customers with new fees without their knowledge. And given Corpay's history with dense, small-print Terms and Conditions, it was also not unreasonable for the court to have concluded it "necessary" to require separate assent for each fee. This requirement ensures the company doesn't intentionally bury fee disclosures in a mountain of confusing text with only one required consent. In sum, the record here warrants this relief.

Corpay argues that the FTC offers no evidence that these reforms will cause more consumers to read fee disclosures. But that argument misses the point. The goal is to make sure that customers who want to know about and understand the fees Corpay charges can easily do so, and Corpay can't deceive them. By requiring Corpay to make disclosures "unavoidable," the court simply requires Corpay to treat its customers fairly. Given the history here, we can't say the district made a clear error in judgment in so ruling.

In all, the district court didn't abuse its discretion fashioning the Express Informed Consent provisions of its injunction.

## III. CONCLUSION

For these reasons, we affirm the grant of summary judgment to the FTC with respect to all counts against Corpay, Inc., and the grant of a permanent injunction with respect to Corpay. We also affirm the grant of summary judgment against Ronald Clarke with respect to all but Count II. But we vacate the grant of summary judgment to the FTC on Count II of its complaint against Clarke.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**